UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

GREG ROBILLARD,

        Plaintiff,

    v.

OPAL LABS, INC.,

        Defendant.

_____

OPAL LABS, INC.

        Counter-Claimant,

    v.

GREG ROBILLARD,

        Counter-Defendant.

_____

Case No. 3:16-cv-00780-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

Plaintiff Greg Robillard brings this action against Defendant Opal Labs, Inc. ("Opal") for alleged violations of the Fair Labor Standards Act ("FLSA") and Oregon law stemming from

Page 1 – OPINION AND ORDER

Opal's failure to pay overtime wages, failure to pay final wages at termination, and breach of contract for failure to pay promised vacation time upon separation of employment. Plaintiff also brings claims for age discrimination under state law, defamation per se, and invasion of privacy. Opal asserts counterclaims for breach of confidentiality, an Oregon Uniform Trade Secrets Act violation, and a federal Defend Trade Secrets Act violation. Plaintiff asserts three retaliation counterclaims premised on Opal's trade secret and confidentiality counterclaims.

Presently before the court are Defendant's Motion for Summary Judgment (ECF No. 107) on all of Plaintiff's claims, and Plaintiff's Motion for Partial Summary Judgment (ECF No. 115) on Opal's counterclaims, his retaliation claims, and Opal's affirmative defense of failure to mitigate damages. For the following reasons, Opal's motion is granted in part and denied in part, and Plaintiff's motion is denied.

### Factual Background

Opal is an Oregon start-up software company. (Decl. Stephen Giannini Supp. Def.'s Mot. Summ. J. ("Giannini Decl.") ¶ 3, ECF No. 110.)[1] Opal's software enables companies to create marketing content and distribute that content across multiple channels, including various social media platforms. (*Id.* ¶ 4.) Opal's software provides a platform for companies to collaborate, refine, and approve advertising campaigns from inception to delivery. (Decl. David Gorman Supp. Def.'s Mot. Summ. J. ("Gorman Decl.") ¶ 7, ECF No. 112.) Through Opal, the companies' final advertising campaign is distributed to various social media sites (Facebook, Twitter, etc.) using outside, third-party distribution platforms such as Hootsuite, Sprinklr, Spredfast, Shoutlet, and

---

[1] The parties in this action have cited to the deposition excerpts of the same witnesses in support of their respective motions. For clarity, the court includes the CM/ECF docket entry for each record citation.

others. (*Id.* ¶ 7.) To work effectively, Opal's software needs to work seamlessly with its customers' computer systems, and with the software of those third-party platforms. (Decl. Damien Munsinger ("Munsinger Decl.") Ex. 4, attaching Dep. David Gorman taken May 3, 2017 ("Gorman Dep.") at 100:14-20, ECF No. 111-4.) The software solutions that enable seamless functionality is called an "integration," and it is custom engineered by writing, testing, and committing code. (Gorman Decl. ¶ 7, ECF No. 112.)

David Gorman, Opal Vice President of Product, and Daniel Barrett, Senior Director of Engineering, identified the need for an integration software specialist, and submitted the hiring request to Opal Chief Executive Officer Stephen Giannini, who makes all Opal hiring and firing decisions. (Gorman Decl. ¶¶ 4-5, ECF No. 112.) Giannini knew Plaintiff's wife socially, and Giannini looked up Plaintiff's profile on Linked In, and noted that Plaintiff graduated from college in 1995, the same year that Giannini graduated from college. (Giannini Decl. ¶¶ 8-9, ECF No. 110.) Thus, Giannini understood Plaintiff to be roughly the same age as Giannini, and assumed Plaintiff was over the age of 40 when he began working at Opal. (*Id.*)

Opal hired Plaintiff as its Lead Enterprise Engineer. (Second Am. Compl. ("SAC") ¶ 6, ECF No. 94; Giannini Decl. Ex. 1, ECF No. 110.) Before hiring, Plaintiff met with Barrett, Gorman, Customer Success Manager Oliver Stewart, and Opal co-founder George Huff, and discussed integrations. (Decl. Courtney Angeli ("Angeli Decl.") Ex. D, attaching Dep. Greg Robillard taken Apr. 17, 2017 ("Pl. Dep.") at 88:6-17, ECF No. 117-4.) Plaintiff directed Gorman to his GitHub account to review programming code that he had written previously. (Pl. Dep. 87:21-88:1, ECF No. 117-4.) And, Plaintiff explained to Gorman that he had successfully implemented integrations at Chirpify, a prior employer. (Gorman Decl. ¶ 11, ECF No. 112.) Opal did not post

the Lead Enterprise Engineer job, and no formal job description was ever created.

Plaintiff's employment began November 10, 2014. Plaintiff's starting salary was $90,000 annually, paid monthly, and included health, dental, and vision benefits, and three weeks of paid time off ("PTO"). (Giannini Decl. Ex. 1, ECF No. 110.) Plaintiff's immediate supervisor was Gorman. (*Id.*) Barrett also supervised Plaintiff. (Decl. Daniel Barrett Supp. Def's Mot. Summ. J. ("Barrett Decl.") ¶ 3, ECF No. 108.) Plaintiff signed an Employment Agreement on November 10, 2014. The Employment Agreement included a section entitled "Confidential Information." (Giannini Decl. Ex. 1 at 2-4, ECF No. 110-1). Plaintiff agreed that he would not improperly disclose any of Opal's Confidential Information. (*Id.*)

Opal hired Plaintiff specifically to perform software engineering work necessary to create integrations, which included designing, scoping, coding, and deploying integrations. (Gorman Decl. ¶ 9, ECF No. 112.) Plaintiff acknowledges that he "was hired to facilitate and manage integrations." (Munsinger Decl. Ex. 1, attaching Pl.'s Supplemental Dep. taken Sept. 5, 2018 ("Pl. Supp. Dep.") at 75:8-14, ECF No. 126-1.)

Plaintiff's job duties at Opal varied and included sales, customer service, coding and programming, providing routine technical support, technical integrations (including integrating Opal's software with customers' existing marketing software), troubleshooting, and making Opal's software available as a new product offering. (SAC ¶ 6, ECF No. 94.) In engineering integrations, Plaintiff needed to use an application programming interface ("API"). An API is a set of subroutine definitions, protocols, and tools for building application software, which helps define methods of communication between various software components and platforms. (Gorman Decl. ¶ 10, ECF No. 112.)

While working for Opal, Plaintiff worked on the Spredfast integration. In doing that work, Plaintiff described that Spredfast had upgraded their API, and that he was required to upgrade Opal's API for it to have continued functionality. (Pl. Dep. 61:24-63:6, ECF No. 117-4.) Plaintiff testified that he wrote the code to rebuild the wrapper for Opal's API, which allows one server to communicate with another server. (*Id.*) Plaintiff also re-wrote the Sprinklr API wrapper for Opal's side of things, and he worked with the Sprinklr team to ensure functionality. (Pl. Dep. 63:1-64:9, ECF No. 117-4.) In March to May 2015, Plaintiff worked on the Shoutlet integration, which involved a "very general Ruby wrapper to communicate with the Shoutlet API." (Pl.'s Dep. 167:16-22, ECF No. 117-4.)

Plaintiff was forty-one at the time he began his employment with Opal. In December 2014, Plaintiff invited coworkers to his forty-second birthday party, and noted that afterward several employees, including Barrett, age thiry-one, and Gorman, age thirty, began treating him differently. (Pl. Dep. 119:23-120:4, ECF No. 117-4.)

Plaintiff contends that Barrett said "thanks dad" when referring to Plaintiff, and that others at Opal referred to him as "old Greg," and "Dad." (Pl. Dep. 132:3-12, 133:8-134:3, ECF No. 117-4.) Plaintiff understood the terms to be perjorative, dismissive, and used to undercut him. (*Id.* at 113:22-25.) Gorman referred to a job applicant as "some old guy in his forties," and criticized others for referring to their computer displays as "monitors" as opposed to "screens." (*Id.* at 132:9-12, 132:19-133:4, 153:3-18, 265:25-266:9.) Plaintiff also recalled other Opal employees posting a meme depicting Steve Buscemi dressed as a high schooler on Opal's internal messaging system called "Slack." (*Id.* at 137:23-139:5; Angeli Decl. Ex. E, attaching Dep. Mary Artz ("Artz Dep.") 28:24-29:4, Ex. 165, ECF No. 117-5.) Also, executive team members described Facebook as an

activity for old people. (Pl. Dep. 132:3-17, ECF No. 117-4.)

Plaintiff contends that the job he was hired to do was ill-defined, and that he felt the customer success team's ("CX team") demands left him no time to perform programming. (Decl. Greg Robillard Supp. Resp. Summ. J. ("Pl. Decl.") ¶ 15, ECF No. 116.) Plaintiff initiated a meeting with Gorman to discuss his job scope, assistance with communication, and managing expectations. (*Id.*) Plaintiff asserts that his conversation with Gorman did not cover his engineering abilities or skills. (*Id.*) Plaintiff insists that he "didn't really get any negative feedback which is why my termination was so surprising." (Pl. Dep. 158:3-7, ECF No. 117-4; Pl. Decl. ¶ 15, ECF No. 116.)

In January 2015, Plaintiff was asked to build and manage a Sprinklr integration for Nike, an important Opal client. (Munsinger Decl. Ex. 5, attaching Dep. M. Stephen Giannini taken May 18, 2017 ("Giannini Dep.") 90:10-19, ECF No. 111-5.) Plaintiff represented to Stewart, the Nike account manager, that the integration was ready to demonstrate. (*Id.* at 94:19-24.) However, the integration failed during the demonstration with the client. (Munsinger Decl. Ex. 6, attaching Dep. Daniel Barrett taken June 13, 2017 ("Barrett Dep.") 197:19-198:22, ECF No. 111-6.)

Matt Oxley, Opal's Vice President of Customer Success, informed Barrett of other instances where Plaintiff was failing to provide engineering status updates to CX account managers. (*Id.* at 218:4-11.) Barrett described that Oxley and Gorman designated a project manager, Clara Luneke, to compile status updates for new client integrations for engineering work assigned to Plaintiff to ensure that the CX account managers were receiving timely information about Plaintiff's progress on the integrations. (*Id.* at 217:17-219:6; Pl. Decl. ¶16, ECF No. 116.)

Barrett contends that he had some conversations with Plaintiff about his performance shortcomings. Barrett stated he had made such efforts "internally, in the sense of I started changing

my approach in the way that I communicated tasks and expectations, but I didn't document that in any kind of formal written process." (Angeli Decl. Ex. C, attaching Barrett Dep. at 184:15-22, ECF No. 117-3.) Barrett detailed a meeting over coffee with Plaintiff in January 2015 in which the two "discuss[ed] performance issues and [ ] concerns." (Barret Dep. at 206:17–210:1, ECF No. 111-6.) Barrett also recalled a "side conversation" in which Barrett told Plaintiff he would stop "hand-holding him" with regard to his duties, "which Barrett characterized as "shield[ing Plaintiff] from his own incompetence by trying to actually resolve issues myself and that I was no longer going to do that." (Barrett Dep. 226:5-228:4, ECF No. 117-3.) Barrett explained he did not recall "sharing specifics about how [he] was communicating [criticisms] of [Plaintiff] to Mr. Gorman" but also noted that he told Gorman about the January 2015 performance meeting with Plaintiff and generally recalled reassuring Gorman that he was addressing Robillard's performance concerns. (*Id.* at 213:10–12; 235:19-236:2; 225:1-6, ECF No. 117-3.) On February 18, 2015, Barrett sent Gorman a message via Slack stating that "I want Greg gone." (Gorman Dep. 242:8-25, Ex. 36, ECF No. 117-2 at 112.) When Gorman asked what was triggered Barrett's message, Barrett informed Gorman it was "[t]he utter lack of urgency combined with the complete 'well what do you want me to do about it' attitude, plus the total lack of technical competency and thoroughness[.]" (*Id.*)

In March 2015, Plaintiff was again tasked with creating an integration demonstration environment for a working group within Apple. (Munsinger Decl. Ex. 7, attaching Dep. Matt Oxley taken on June 27, 2017 ("Oxley Dep.") 130:18-25, ECF No. 111-7.) Oxley believes the failure to timely complete the integration demonstration environment caused Apple to choose not to work with Opal. (*Id.* at 126:21-127:25.) Plaintiff maintains the difficulty with the Apple

integration was caused by Sprinklr, not Opal. (Pl. Decl. ¶ 22, ECF No. 116.)

Plaintiff contends that Gorman and Barrett plotted to get him fired. (Barrett Dep. 207:23-211:19; 215:21-216:15, ECF No. 117-3; Gorman Dep. 257:13-24, ECF No. 117-2.) On April 30, 2015, Barrett and Gorman met with Operations Manager Jacqueleine Marushia-Laurain concerning Plaintiff's job performance. (Decl. Robert Scott Supp. Def.'s Mot. Summ. J. ("Scott Decl." ¶¶ 15, 16 & Ex. 2, ECF No. 109.) Marushia-Laurain noted the absence of any formal documentation about Robillard not meeting expectations, and she inquired about the clarity of expectations and follow-up conversations. (Angeli Decl. Ex. F, attaching Dep. Jacqueleine Marushia-Laurain taken June 29, 2017 ("Marushia-Laurain Dep.") Ex. 45, ECF No. 117-6 at 39.) Marushia-Laurain asked Barrett to detail concrete examples of Plaintiff's performance difficulties. (*Id.*) Barrett authored a document entitled "Salient Events," detailing several instances of Plaintiff's shortcomings. (Barrett Dep. Ex. 38, ECF No. 117-3 at 75.) However, it is unclear whether Barrett discussed any of the events with Plaintiff in a formal way. (Barrett Dep. 188:23-190:2, 190:11-192:8, ECF No. 117-3.)

Marushia-Laurain testified that her discussions with Barrett and Gorman led to a corrective action plan by which Opal would transition Plaintiff into a more suitable role, entitled Account Integrations Manager. (Marushia-Laurain Dep. 127:6-17, 136:7-19, 140:6-141:10, Exs. 45, 54, ECF No. 117-6 at 39-40; Scott Dep. 95:25-96:14, ECF No. 111-8.) On May 11, 2015, Marushia-Laurain informed Scott and Giannini about her discussions with Barrett and Gorman, and the plan for transitioning Plaintiff to the new role. (Marushia-Laurain Dep. Ex. 54, ECF No. 117-6; Scott Decl. ¶¶ 15-16 & Exs. 1&2, ECF No. 109.) The plan identified specific areas where Plaintiff's performance was not meeting expectations and identified specific areas needing improvement,

including communication, ownership, proactive behavior, and attitude. (Scott Decl. Ex. 2, ECF No. 109.) Gorman indicated that Plaintiff had been provided multiple opportunities to course correct, but persistently had failed. (Gorman Dep. 299:25-300:7, Ex. 46, ECF No. 117-2.) The Plan to transition Plaintiff into the new role was set to occur in June 2015. (Munsinger Decl. Ex. 8, attaching Dep. Robert Scott taken May 23, 2017 ("Scott Dep.") 109:9-21, ECF No. 111-8.)

On May 29, 2015, Plaintiff was expected to attend an important meeting with Stewart and Opal client Whole Foods. Plaintiff had confirmed via text the previous day that he would be attending the meeting. (Munsinger Decl. Ex. 9, attaching Dep. Oliver Stewart taken Oct. 2, 2017 ("Stewart Dep.") 56:20-57:14, ECF No. 111-9.) On the morning of March 29, 2015, Plaintiff's wife was heading out of town, and his son became emotional in her absence, requiring his attention. (Pl. Dep. 225:8-21, ECF No. 117-4; Pl. Decl. ¶ 18, ECF No. 116.) Plaintiff did not inform Stewart that morning that he would not be on the phone call, and during the call, Stewart attempted to reach Plaintiff, but was unable to do so. (Stewart Dep. 51:1-5, ECF No. 111-9.) Plaintiff reached out to Stewart after he arrived at work to apologize for missing the meeting. (Pl. Dep. 223:2-224:14, ECF No.117-4.)

After Plaintiff missed the meeting, Stewart was furious and contacted Oxley, his boss. (Stewart Dep. 45:23-46:4, ECF No. 111-9.) Oxley believed Opal's relationship with Whole Foods was in jeopardy as a result of the missed call and integration demonstration because the relationship with client was at a pivotal moment. (Oxley Dep. 84:2-11, ECF No. 111-7.) Oxley called Giannini, who was out of the office. Oxley informed Giannini about the situation, and that he, Oxley, did not want to continue working with Plaintiff. (Id.; Giannini Dep. 151:7-23, ECF No. 111-5.) Oxley also informed Scott that Plaintiff had "blown off" the Whole Foods meeting. (Scott

Dep. 112:6-22, ECF No. 111-8.) Scott called Giannini and explained that he was recommending that Plaintiff be terminated. (Giannini Dep. 152:21-153:9, ECF No. 111-5.) Giannini viewed the missed call as acute and represented a serious disregard for the value of Opal's customer relationships; thus, he decided to terminate Plaintiff's employment. (Giannini Decl. ¶ 11, ECF No. 110.)

Plaintiff was surprised that a short time after missing the meeting, Robert Scott, Opal's General Counsel, and Gorman called Plaintiff into a meeting and abruptly fired him. At the meeting, Opal informed Plaintiff that he was being fired because he missed a meeting, and for performance reasons, including a delayed the Apple integration. (Pl. Dep. 155:19-156:13, 230 18:231:3, ECF No. 117-4.) Scott testified that he suspected that Plaintiff had not been told about performance issues. (Angeli Decl. Ex. G, attaching Scott Dep. 120:2-121:23, ECF No. 117-7.)

Shortly after terminating Plaintiff, Giannini and Scott called a company-wide meeting, and notified Opal employees that Opal had fired Plaintiff for cause, and that despite providing Plaintiff opportunities to improve, Plaintiff had not improved, and left Opal with no decision but to terminate Plaintiff. (Scott Dep. 43:8-44:2, 46:16-47:3, 50:4-51:14, ECF No. 117-7.)

After Plaintiff's termination, Opal did not fill the Lead Enterprise Engineer position. (Giannini Dep. 19:12-20:15, ECF No. 111-5; Barrett Dep. 167:11-15, ECF No. 111-6.) Opal states that integration duties were absorbed by Barrett and other backend engineers. (Barrett Dep. 167:11-15; Giannini Dep. 19:7-21.) Plaintiff contends that his integrations job duties were absorbed by Alex Hunley, then thirty-two years old, and that his CX duties were handled by Mark Wood, then twenty-nine. (Gorman Dep. 262:20-263:11, ECF No. 117-2; Marushia-Laurain Dep. 212:17-25, ECF No. 117-6; Angeli Decl. Ex. K, attaching Stewart Dep. 15:20-25, ECF No. 117-

11.)

The day Plaintiff was terminated, Barrett visited Plaintiff's personal GitHub account and there found the Shoutlet code publicly available. (Barrett Dep. at 41:9-15, ECF No. 126-2.) While working for Opal, from March to May of 2015, Plaintiff created an integration code entitled "Shoutlet" that he posted or "pushed" to his public GitHub repository or account. (Munsinger Decl. Ex. 1, attaching Supp. Dep. Greg Robillard taken Sept. 5, 2018 ("Pl. Supp. Dep.") 52:1-19, 57:20-22, ECF NO. 126-1.) Plaintiff's personal GitHub user page, including his repositories, contain source code and are publicly available. (Pl. Answer to Am. Countercls. ¶¶ 18-22, ECF No. 101.) After finding the code on Plaintiff's public GitHub site, Barrett copied it and placed it into Opal's private GitHub repository. (Barrett Dep. at 41:18-24, ECF No. 126-2.) Barrett informed Gorman that he found the Shoutlet code on Plaintiff's public GitHub account. (Barrett Dep. at 44:2-6, ECF No. 126-2.)

On June 15, 2015, Plaintiff sent an email to a prospective employer at the software company Bidsketch which included the web address for the Shoutlet code on Plaintiff's GitHub repository. (Munsinger Decl. Ex. 2, ECF No. 111-2.) On October 7, 2015, Plaintiff sent an email to another prospective employer at software company The Dyrt, also including the address for the Shoutlet code on his GitHub repository. (Munsigner Decl. Ex. 3, ECF No. 111-3.)

Shortly after Plaintiff's employment with Opal ended, Plaintiff created a second publicly-available repository on GitHub that included code that he wrote while at Opal, entitled "Suez." (Pl. Supp. Dep. 60:19-61:11, ECF No. 126-1.) Plaintiff stated that he created the Suez code from memory based on something he did for Opal, and that he had copied from Stack Overflow. (Pl. Supp. Dep. 61:12-18, ECF No. 126-1.)

When Scott reviewed documents produced in this case, he realized that Plaintiff had directed others outside of Opal to review Opal's code. (Decl. Robert Scott ¶ 10, ECF No. 124.) On December 5, 2016, Opal sent a Cease and Desist letter to Plaintiff's attorney, demanding that Plaintiff remove Opal's code from his public GitHub account. (Munsinger Decl. Ex. 1, ECF No. 63-1.) On December 12, 2016, Opal sent a follow-up letter to Plaintiff's attorneys. (*Id.*) On March 13, 2017, Opal sent a third letter, renewing the demands of the prior letters. (Munsinger Decl. Ex. 2, ECF No. 63-2.) On March 29, 2017, Opal amended its Answer to add the current counterclaims. On April 16, 2017, Plaintiff removed the Shoutlet repository from his publicly available GitHub account. On June 10, 2017, Plaintiff removed the Suez repository from his publicly available GitHub account. (Munsinger Decl. Supp. Mot. Compel ¶ 3, ECF No. 70.) On June 26, 2018, Plaintiff filed a Second Amended Complaint, adding claims for retaliation. In claims six, seven, and eight, Plaintiff alleges that Opal has added its confidentiality and trade secret counterclaims because he has asserted state and federal wage violations and age discrimination by filing this action. (SAC ¶¶ 73-109, ECF No. 94.)

Opal now moves for summary judgment on all of Plaintiff's claims. Opal contends that it is entitled to summary judgment on Plaintiff's age discrimination claim because the same person who terminated Plaintiff was responsible for his hiring and was aware that Plaintiff was over forty years old when hired. Opal argues that Plaintiff cannot establish a prima facie case of age discrimination because he was not performing his job satisfactorily, and even if he could state a prima facie case of age discrimination, his claim would fail because he was not replaced with a younger employee. Opal seeks summary judgment on Plaintiff's federal and state wage claims, arguing that Plaintiff's job falls within the computer employee exemption. Opal maintains that it

did not promise Plaintiff three weeks of vacation, and it did not fail to pay him all wages due at termination. Opal moves for summary judgment on Plaintiff's invasion of privacy and defamation per se claims because the alleged statements were not published to a third party and he cannot establish that the alleged statements were made with malice.

Opal also seeks summary judgment on its counterclaims against Plaintiff for breach of contract, Oregon's Uniform Trade Secrets Act, and Defend Trade Secrets Act. Opal argues that Plaintiff breached his Employment Agreement by posting its confidential information on a public website. Opal also contends that Plaintiff has admitted to posting its confidential coding information on his public website.

Lastly, Opal seeks summary judgment on Plaintiff's three retaliation claims, all of which are premised on Opal asserting counterclaims. According to Opal, because its counterclaims are not baseless, may fairly be considered compulsory, and there is no evidence of retaliatory motive, it is entitled to summary judgment on Plaintiff's retaliation claims.

Plaintiff cross-moves for partial summary judgment on Opal's counterclaims for breach of contract and trade secret violations. Plaintiff argues that creating the Shoutlet repository was within the scope of his employment and that Opal consented to its posting on a public website. Plaintiff seeks summary judgment on his retaliation claims, contending that no reasonable juror could conclude that Opal's counterclaims are brought in good faith or are reasonably based in fact and law. Finally, Plaintiff seeks summary judgment on Opal's affirmative defense of failure to mitigate, arguing that he has reasonably sought other employment since his termination from Opal.

////

////

*Legal Standard*

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party seeking summary judgment bears the burden of establishing the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates no issue of material fact exists, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A party cannot defeat a summary judgment motion by relying on the allegations set forth in the complaint, unsupported conjecture, or conclusory statements. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Summary judgment thus should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In determining whether to grant summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Curley v. City of N. Las Vegas*, 772 F.3d 629, 631 (9th Cir. 2014); *Hernandez*, 343 F.3d at 1112. All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there

is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

Where, as here, the parties have each filed motions for summary judgment, "[e]ach motion must be considered on its own merits." *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id.*; *Acosta v. City Nat'l Corp.*, 922 F.3d 880, 885 (9th Cir. 2019). The Court must deny both motions if it finds a genuine issue of material fact precludes resolution, "[b]ut if there is no genuine dispute and one or the other party is entitled to prevail as a matter of law, the court will render judgment." *10A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2720 (4th ed. 2019).*

*Discussion*

I.     Plaintiff's Wage and PTO Claims

In his first and second claims for relief, Plaintiff seeks damages for Opal's failure to pay overtime wages, in violation of the Fair Labor Standards Act ("FLSA") and Oregon wage laws. 29 U.S.C. § 207; OR. REV. STAT. §§ 653.055, 653.261. Plaintiff alleges that his work for Opal did not qualify for exemption from overtime, that he worked 540 hours of overtime, and that he is entitled to wages, penalties, interest, and attorney fees. In his third claim for relief, Plaintiff alleges that Opal promised him three weeks of paid time off, and that Opal breached that agreement when it failed to pay him for two weeks of leave when it terminated him. In his fourth claim for relief, Plaintiff asserts that Defendants failed to pay him all wages and compensation owed at the time of his termination, and that under O.R.S. § 652.140, he is owed overtime compensation, PTO, and associated penalties and attorney fees.

Opal moves for summary judgment on Plaintiff's wage claims, arguing that he qualified as a computer employee, exempt from overtime requirements. Opal also argues that Plaintiff was not promised three weeks of PTO, and therefore, it has not committed any state or federal wage violations.

A.   *Computer Employee Exemption*

The FLSA creates a private cause of action for an employee to recover unpaid overtime wages and back pay against his employer, if the employee is not paid the statutory wage. *Flores v. City of San Gabriel*, 824 F.3d 890, 895 (9th Cir. 2016). The FLSA requires that employers pay their employees time and one-half for any work exceeding forty hours per week. 29 U.S.C. § 207(a)(1); OR. REV. STAT. §§ 653.055, 653.261 (same). However, certain executive, professional, and administrative employees are exempt from overtime requirements. *See* 29 U.S.C. § 213 (describing exempt jobs). To be considered exempt, an employee must satisfy three tests: (1) salary basis test, requiring that an employee receive a predetermined amount, not subject to reductions for quality or quantity of the work performed; (2) the salary level test, providing the employee receive a minimum amount; and (3) the duties test, which focuses on whether the employee's "primary duties" are those of an executive, professional, or administrative employee. *Curry v. Matividad Med. Ctr.*, Case No. 5:11-cv-04662 EJD, 2013 WL 2338110, at *3 (N.D. Cal. May 28, 2013) (discussing FLSA computer employee exemption standards); *see* 29 C.F.R. §§ 541.602 (defining salary basis), 541.600 (defining salary level), 541.700(a) (defining primary duty as the "principal, main, major or most important duty the employee performs"). The amount of time an employee spends performing exempt work can be a "useful guide" to assessing whether the employee's primary duty is exempt work, and "employees who spend more than 50 percent of

their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test[.]" 29 C.F.R. § 541.700(b).

Federal and state law provide an exemption from overtime for employees hired as computer systems analysts, computer programmers, software engineers, and other similarly skilled workers in the computer field. 29 U.S.C. § 213(a)(1); 29 C.F.R. § 541.400; OR. REV. STAT. § 653.020(3); OR. ADMIN. R. 839-020-0125(2)(h). The relevant federal and state regulatory provisions use nearly identical language to define the computer employee exemption. To qualify, the employee must be paid a minimum rate of $27.63 per hour, and the employees' primary job duties must consist of the following:

> (A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

> (B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;

> (C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or

> (D) a combination of duties described in subparagraphs (A), (B), and (C), the performance of which requires the same level of skills[.]

29 U.S.C. § 213(a)(17); *see also* 29 C.F.R. § 541.400(b); OR. ADMIN. R. 839-020-0125(2)(h) (providing same primary job duties). The Supreme Court has determined that exemptions under the FLSA are to be given a "fair reading." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (finding automobile service advisors were exempt from overtime regulations).

*B.      Plaintiff's Job Duties at Opal Fall Within Computer Employee Exemption*

The parties do not dispute that Plaintiff was paid on a salary basis and that he earned an

annual salary equivalent to $90,000, well above the minimum salary level. (Giannini Decl. Ex. 1, ECF No. 110.) (providing Plaintiff's salary is $90,000 per year, paid monthly). The parties dispute only whether Plaintiff's primary duties satisfy the computer employee exemption.

Plaintiff argues that he performed some job duties that fall within the computer exemption, but that his primary job duties were more akin to non-exempt technical IT support staff. Plaintiff contends that he spent less than two hours each day coding, instead spending most of his time attending customer sales demonstrations, customer meetings, coordinating with partners, configuring software, and assisting with customer issues. (Pl.'s Decl. ¶ 59, ECF No. 116.) According to Plaintiff, because there is a genuine dispute about his primary job duties, summary judgment should be denied. Opal responds that when taking Plaintiff's deposition and declaration testimony as true, his job duties clearly fall within computer employee exemption. The court agrees with Opal.

Plaintiff's primary duties included a combination of the duties covered in 29 U.S.C. § 213(a)(17). *Bobadilla v. MDRC*, No. 03 Civ. 9217, 2005 WL 2044938, at *7-8 (S.D.N.Y. Aug. 24, 2005) (describing numerous exempt activities performed by employee). For example, in his Declaration, Plaintiff provides that seventy percent of his time "was spent configuring software (i.e., adding users and managing licenses), assisting the Tech Support team with customer issues, attending customer sales demos and meetings, and meeting and coordinating with third party software providers." (Pl.'s Decl. ¶ 59, ECF No. 116.) In his Declaration, Plaintiff further elaborates on the assistance he provided to Tech Support. Plaintiff indicates that a low-level tech support staff would elevate users' questions to him if they related to integrations. (*Id.* ¶ 60.) Plaintiff would then call the Opal user in order the accurately diagnose the problem. (*Id.* ¶ 61.) Plaintiff describes that

the issues that were brought to his attention were not "problems or bugs" that could be fixed with coding, but often were caused by network problems or user error. (*Id.* ¶ 62.) Plaintiff provides that other times, the errors were related to integrations or were caused by misconfigured settings of third-party partners (such as Spredfast, Shoutlet, or Sprinklr). In such situations, Plaintiff would have to open a "ticket" with technical support, then relay their response to the end user. (*Id.* ¶ 63.) Plaintiff also provides that some problems Opal users experienced were on Opal's end, the "majority of the time the 'fix' did not involve any coding or programming" but he would resolve the issue by adjusting the customer's settings. (*Id.* ¶ 65.)

In his deposition, Plaintiff described a similar process of replicating a problem that the user described, diagnosing the issue, then depending on the situation, writing code to fix the problem. (Pl.'s Dep. 49:17-23, 50:20-51:17, ECF No. 117-4.) Plaintiff testified that he would spend a couple of hours each day consulting with users. (*Id.* at 55:20-23.) Plaintiff also acknowledged that it was his responsibility to ensure the "bugs" got fixed, and that he possessed the necessary technical skills and ability fix the users' problems himself. (*Id.* at 48:2-18.) Thus, as described by Plaintiff, he was engaged in exempt work by applying analysis techniques and procedures, including consulting with users, to determine software or system functionality. *See Grills v. Hewlett-Packard Co*, 88 F. Supp. 3d 822, 826-27 (N.D. Ohio 2015) (finding that skilled computer employee was exempt under § 213(a)(17) and 29 C.F.R. § 541.400 where his primary duties involved troubleshooting issues elevated from help desk, and required him to find root cause of issue, run tests, and create a solution to resolve the issue); *Ortega v. Bel Fuse, Inc.*, Case No. 15-21229-CIV-Altonaga, 2016 WL 1588393, at *12-13 (S.D. Fla. Apr. 20, 2016) (finding employee satisfied computer employee exemption where evidence showed he was responsible for troubleshooting,

managed a production database, operated two test databases, and operated wireless network).

Additionally, Plaintiff described that while working for Opal, he conducted three security reviews for Opal clients, and that he was responsible for "writing the whole thing." (Pl. Dep. 58:5-14, ECF No. 117-4.) Additionally, Plaintiff admits that he worked on programming a custom integration for Nike in early 2015, he re-wrote the integration for Sprinklr, he created a Ruby library for the Shoutlet API, as well as other integrations. (Pl.'s Decl. ¶¶ 20-21, 33, ECF No. 116.) As part of his work on integrations for Nike and Apple, he created "demonstration environments" to show how the Opal platform would operate prior to bringing the application "live" for the client. (Pl. Decl. ¶¶ 20-22, ECF No. 116.) Plaintiff acknowledges that he was "hired at Opal to coordinate the integrations" and that he considered himself to be part of the back-end engineering team. (Pl. Dep. 47:23-48:1, 87:4-8, ECF No. 117-4.) Again, as described by Plaintiff, he designed, analyzed, and tested the computer programs (the integrations) that were related to user or system design specifications, which fall well within the primary duties of a computer employee under § 213(a)(17).

After his employment with Opal ended, Plaintiff described his capabilities as developing "high quality web applications, both as a back-end developer and database administrator." (Scott Decl. Ex. 1 at 2, ECF No. 124-1.) On his resume following his employment with Opal, Plaintiff identified his job duties while employed with Opal as:

> Leveraged third-party APIs to build social media publishing tools for integration with Shoutlet, Spredfast, and Sprinklr. Wrote Ruby gems with RSpec tests to support integrations. Helped back-end team refactor and troubleshoot Ruby on Rails code base. Supported sales, customer success teams with software demos and configurations.

(Pl. Dep. 91:9-20, ECF No. 117-4.)

Also, during Plaintiff's tenure at Opal, it employed two "Support Specialists" who were compensated considerably less than Plaintiff, earning approximately $42,000 and $35,000 per year. (Scott Decl. at ¶¶ 7-8, ECF No. 109.) Plaintiff's annual salary was more than the two support specialists combined.

Based on Plaintiff's own description of the work he performed at Opal, he performed work more complex than that of a non-exempt IT help desk worker. Opal correctly classified him as exempt. Because there is no genuine issue of fact as to whether Plaintiff was correctly classified as an exempt computer employee, Opal's motion for summary judgment on Plaintiff's first and second claims for relief are granted.

### C. Opal's Motion on Plaintiff's Claim for PTO

In his third claim for relief, Plaintiff alleges that he had an enforceable contract for three weeks of paid time off ("PTO") during each year. (SAC ¶¶ 49-54, ECF No. 94.) Plaintiff asserts that he used one week of paid vacation during his employment with Opal, and thus is entitled to two weeks of unused PTO. In his fourth claim for relief, Plaintiff seeks statutory penalties and fees as a result of Opal's failure to pay him for the unused PTO and overtime wages at his termination. (*Id.* ¶¶ 56-61.)

Opal seeks summary judgment on Plaintiff's claim for two weeks of PTO, arguing that Plaintiff was not promised three weeks of paid vacation and that it did not violate state law by failing to pay him for unused PTO at his termination. Plaintiff responds that the parties' agreement is ambiguous about vacation pay, and that summary judgment must be denied.

### 1. contract standards

"Vacation pay is a matter of contract between the employer and employee." *Wheeler v.*

*Mission Elec. & Plumbing Supply, Inc.*, 267 Or. 209, 210 (1973) (citing *State ex rel. Nilsen v. Oregon Motor Ass'n*, 248 Or. 133, 136 (1967)); *State ex rel. Roberts v. Public Finance Co.*, 294 Or. 713, 716 (1983) ("The employment contract itself will control the employee's right to vacation.") Generally, "[i]n a contract dispute, a party will be entitled to summary judgment only if the governing terms of the contract are unambiguous." *Milne v. Milne Construction Co.*, 207 Or. App. 382, 388 (2006) (citing *Hauge v. Vanderhave*, 121 Or. App. 221, 225 (1993)). A contract provision is ambiguous where it is susceptible to "more than one plausible – that is, sensible and reasonable – interpretation." *Milne*, 207 Or. App. at 388 (citing *Deerfield Commodities, Ltd. v. Nerco, Inc.*, 72 Or. App. 305, 317 (1985)). A court may refer to parol evidence to evaluate the ambiguity of a contract term. *Id.* (citing *Deerfield Commodities*, 72 Or. App. at 317). If the court finds that the contract term is genuinely ambiguous, the meaning of that term is a question of fact. *Id.* at 389 (citing *Hauge*, 121 Or. App. at 224).

   2.   analysis

The parties do not dispute that Plaintiff's employment contract is for employment at will, which was terminable by either party at any time for almost any reason. *State ex rel. Roberts*, 294 Or. at 718. Plaintiff contends that the relevant portions of the parties' agreement concerning vacation pay are contained in his October 23, 2014 offer letter ("Offer Letter"). (Giannini Decl. Ex. 1, ECF No.110-1.) Opal contends that the details concerning PTO are in Opal's Employee Handbook, referenced in the Offer Letter. The court examines the Offer Letter, Plaintiff's Employment Agreement, and Opal's Employee Handbook to determine whether and under what terms the parties agreed with respect to PTO.

In relevant part, the Offer Letter provides the following:

> This offer includes three (3) weeks Paid Time Off (PTO) per year, but Opal has a liberal vacation policy as long as advance notice is provided and performance objectives are achieved. Details about our vacation policy are contained in the Employee Handbook.

(Giannini Decl. Ex. 1 at 1, ECF No. 110-1.) Plaintiff also signed an Employment Agreement on November 10, 2014. (*Id.* at 7.) That agreement provides in relevant part that Plaintiff's employment was "at will" and could be terminated by either party at any time for any or no reason; it provided that Plaintiff's compensation was $90,000 per year, payable in regular increments; and it provided that Opal shall pay Plaintiff "for time worked through the effective date of termination." (*Id.* at 2-3.) Additionally, the Employee Agreement provided that Plaintiff "shall be entitled to vacation, sick leave, and holidays according to Company's applicable policies." (*Id.* at 3.)

The Employee Handbook provides the following concerning employee time off:

> Work to live, don't live to work. Our general guideline around time off is that we encourage employees to take three paid weeks off each year. As a policy, we do not track paid time off, but trust our employees to manage their time off and help us optimize personal time while recognizing and supporting the resource needs of our company and our customers.

(Scott Decl. Ex. 3 at 4, ECF No. 109-3 at 4.) The Employee Handbook also contains the following about employee separation and final pay:

> To ensure timely final pay, a final record of your hours worked through your last day of employment must be submitted no later than 5:00 p.m. one day prior to your last day. This should include your estimated hours through your last day. Your final pay will be issued as a check and made available to you at the end of your last day of work . . . .

> Benefits-eligible employees and their dependents may be eligible to continue medical and/or dental coverage for a period of time at the employee's own expense. If you are participating in benefits at the time of your separation, you will receive information by mail to the home address we have on record. The packet of information will include instructions regarding enrollment and deadlines. It is the employee's responsibility to ensure timely enrollment based on the information provided in the packet.

(*Id.* at Ex. 3 at 6.)

Opal maintains that nowhere in the Offer Letter or Employee Handbook did it agree to pay Plaintiff at termination for unused vacation. Opal contends that the Offer Letter simply provides up to three weeks of paid leave annually if notice is given and performance objectives are achieved. Opal notes that the Employee Handbook simply "encourages" three weeks of vacation per year, making vacation pay discretionary. Additionally, Opal contends that it does not track leave, that leave is not accrued, and that it does not promise to pay employees for unused vacation time at separation, and therefore, Plaintiff's breach of contract claim fails as a matter of law. *See State ex rel Nilsen*, 248 Or. at 136 (holding that where granting paid vacation is discretionary, it is a gift).

Plaintiff contends that summary judgment must be denied because the parties' agreement concerning PTO is ambiguous. Plaintiff argues that the Offer Letter is susceptible to two reasonable interpretations, and therefore, a jury must determine its terms. Plaintiff argues that the parties did not agree that his PTO would be forfeited, the Employment Agreement provides that he is "entitled" to vacation time, and that his interpretation that the PTO policy required that he be paid out for unused vacation time is plausible. Plaintiff argues that whether he is entitled to PTO at termination is ambiguous and summary judgment must be denied. *Milne*, 207 Or. App. at 389 ("The meaning of an ambiguous contract term is a question of fact.")

Viewing the Offer Letter, Employment Agreement, and Employee Handbook in the light most favorable to Plaintiff, the court finds that genuine issues of fact remain about what Opal promised to pay with respect to unused PTO at termination. The Offer Letter itself provides that the offer "includes three weeks" of PTO and suggests that additional time may be taken because of its "liberal vacation policy." Thus, the Offer Letter implies that three weeks of leave is a floor,

Page 24 – OPINION AND ORDER

not a ceiling. The Offer Letter references the Employee Handbook, which states that employees are "encouraged" to take three weeks of paid leave and specifically states that leave is not tracked or monitored. And, the Employment Agreement provides that employees "shall be entitled" to three weeks of leave. The court finds that Plaintiff has presented a plausible, sensible interpretation of the parties' agreement concerning PTO.

Therefore, the court finds that a genuine issue of material fact about payment of unused PTO at the time of separation exists, and Opal's motion for summary judgment on Plaintiff's breach of contract claim is denied. *State ex rel. Roberts*, 294 Or. at 718-19 (granting summary judgment to employer where payment of vacation was qualified in contract by the employee's employment on anniversary date). Because the court has determined that summary judgment is not appropriate on Plaintiff's breach of contract for PTO (claim three), consequently, Opal's motion for summary judgment also is denied on Plaintiff's claim four, failure to pay all wages at termination.

II.     Plaintiff's Age Discrimination Claim

In Plaintiff's fifth claim for relief, he alleges Opal discriminated against him by terminating him because of his age and that he was replaced by a younger employee. Opal seeks summary judgment because the same person who terminated Plaintiff also was responsible for hiring him, giving rise to the same-actor inference of non-bias. Opal argues that Plaintiff cannot establish a prima facie case of age discrimination because he was not performing satisfactorily and was not replaced with a substantially younger employee. Opal contends that even if Plaintiff establishes a prima facie case, it had a legitimate, non-discriminatory reason for his termination and there is no evidence of pretext. Plaintiff responds that summary judgment must be denied because there is

direct evidence of age-bias, and alternatively, because he has established a prima facie case of age-bias and pretext.

A.    *Age Discrimination Standards – ORS 659A.030*

Under Oregon law, it is unlawful for an employer to discriminate "because of an individual's age." OR. REV. STAT. § 659A.030(a)(1); *accord* 29 U.S.C. § 623(a)(1) (holding that under the ADEA, it is unlawful to discriminate against individuals who are at least forty years of age). "Age discrimination claims are analyzed under the "but for" standard, meaning that a plaintiff must establish that age was the "but for" cause of the adverse employment action taken against the plaintiff." *Lanyon v. Interfor U.S. Inc.*, Case No. 1:16-cv-20580-MC, 2018 WL 1976023, at *2 (D. Or. Apr. 26, 2018) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)); *Shelley v. Geren*, 666 F.3d 599, 607 (9th Cir. 2012); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (holding that in ADEA disparate treatment claim "'the plaintiff's age must have actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome.'") (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993) (alteration in original)).

On summary judgment, age discrimination claims under Oregon law are analyzed under the familiar burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1090-93 (9th Cir. 2001); *Noga v. Costco Wholesale Corp.*, 583 F. Supp. 2d 1245, 1256 (D. Or. 2008) (providing age discrimination claims under Oregon law follow *McDonnell Douglas* burden-shifting framework). Under that framework, an employee challenging an adverse employment action has the initial burden of establishing a prima facie case of discrimination. *Scott v. Sears, Roebuck and Co.*, 395

F. Supp. 2d 961, 973 (D. Or. 2005). A prima facie case may be established by either direct or circumstantial evidence. *Id.* "Direct evidence, in the context of an ADEA claim, is defined as evidence of conduct or statement[s] by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude." *Id.* (internal quotations and citations omitted). "Direct evidence of discriminatory intent consists of 'evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption.'" *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1280 (9th Cir. 2017) (quoting *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 662 (9th Cir. 2002) (alteration in original). Direct evidence does not need to be specific and substantial. *Mayes*, 846 F.3d at 1280; *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998).

Absent direct evidence, a plaintiff may establish a prima facie case of age discrimination by showing that: "(1) he belongs to a protected class; (2) he was performing his job satisfactorily; (3) he was subject to an adverse employment action; and (4) he was . . . replaced by a substantially younger employee with equal or inferior qualifications[.]'" *Lanyon*, 2018 WL 1976023, at *2 (quoting *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000)); *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 891 (9th Cir. 1994).

The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Scott*, 395 F. Supp. 2d at 973; *McDonnell Douglas*, 411 U.S. at 802. If the employer does so, then the burden shifts back to the employee to demonstrate that the defendant's purportedly neutral reason is a pretext for unlawful discrimination. *McDonnell Douglas,* 411 U.S. at 804.

"The standard for establishing a prima facie case of discrimination under Oregon law is

identical to that used in federal law." *Snead*, 237 F.3d at 1087; *Shepard v. City of Portland*, 829 F. Supp. 2d 940, 963 (D. Or. 2011); *Jamal v. Wilshire Mgmt. Leasing Corp.*, 320 F. Supp. 2d 1060, 1069 (D. Or. 2004) (holding standard for prima facie case of age discrimination identical under Oregon and federal law).

B.      *Direct Evidence*

Plaintiff contends that there is ample direct evidence of age discrimination. Plaintiff argues that Barrett and Gorman engaged in a campaign to have him terminated because he was older. The court first examines each of the alleged discriminatory comments Plaintiff cites to support his claim. He contends that Barrett regularly referred to him as "Dad" and "Old Greg," and that Barrett used these names to disparage his input on projects and technical matters. In his deposition, Plaintiff testified that Barrett "frequently would say thanks dad in the workplace when I was making a suggestion about something technical[;]" he recalled that Barrett made such comments three or four times. (Pl. Dep.   132:3-8, 150:18-151:14.) Plaintiff also testified that his co-worker Ben Crowe, not Barrett, referred to him several times as "old Greg." (Pl. Dep. 136:20-137:9.) As further evidence of Barrett's alleged discriminatory animus, Plaintiff highlights that on July 7, 2013, Barrett retweeted an article entitled *Technology Workers Young (Really Young)*, commenting that "[a]t 32, I'm over the hill in tech." (Barrett Dep. Ex. 80, ECF No. 117-3 at 77.) Plaintiff contends that the article shows age bias because it indicates young workers are a hallmark of growing and innovating companies, and that older companies who do not change with the times get older workers. Additionally, Plaintiff argues that Barrett's statements did not begin until after Barrett realized Plaintiff was forty-two, "plainly old in his view as he was expressing angst over turning 32." (Pl.'s Resp. Mot. Summ. J. at 31, ECF No. 118.)

Plaintiff similarly contends that Gorman, who was enlisted by Barrett, shared Barrett's age bias. During his deposition, Plaintiff testified that he overheard Gorman referring to an individual he had recently interviewed as "some old guy in his forties." (Pl. Dep. 132:24-133:4, ECF No. 117-4.) Plaintiff also testified that Gorman said he hates it when people refer to their computer screens as "monitors" as opposed to a "displays." (*Id.* at 153:7-18.)

Finally, Plaintiff contends that others at Opal made ageist comments, including the posting an offensive gif involving the actor Steve Buscemi dressed as a high school student. When asked about the gif, Plaintiff testified in his deposition that it was not sent directly to him, was not direct messaged to him, and that it did not refer to him directly; rather, the gif "popped up" up on various Slack channels during his employment. (*Id.* at 138:6-139:13.)

The court finds the evidence identified by Plaintiff does not rise to "direct evidence" of discriminatory animus. *Mayes*, 846 F.3d at 1280 (holding direct evidence of discriminatory intent is that which proves discriminatory animus without inference or presumption). "Direct evidence, in the context of an ADEA claim, is defined as 'evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision.'" *Enlow v. Salem-Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 812 (9th Cir. 2004) (quoting *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426 (8th Cir.1999) (internal quotation marks omitted)).

Of the allegedly discriminatory evidence identified, only Barrett's "thanks dad" statements were directed to Plaintiff by a supervisor. The court finds the "thanks dad" statements are not overtly ageist in nature, as parents may be less than forty years old. Here, the "thanks dad"

statements by Barrett require the court to presume or infer discriminatory animus, and by themselves are not direct evidence of age discrimination. *See Peters v. Shamrock Foods Co.*, 262 F. App'x 30, 32 (9th Cir. 2007) (holding status as "mom" did not constitute direct evidence of gender discrimination because term is ambiguous); *Blikas v. Rests. Unlimited*, Case No. 3:09-cv-1324-AC, 2011 WL 5239749, at *12 (D. Or. Aug. 18, 2011), *adopted* 2011 WL 5239872 (Oct. 31, 2011), *aff'd* 486 F. App'x 700 (9th Cir. 2012) ("Not every comment about a worker's age is direct evidence of age discrimination). Also, the "thanks dad" statement is not alleged to have been made in connection with the decisional process of whether to retain Plaintiff's employment. *Compare Mayes*, 846 F.3d at 1280 (finding statements by supervisor that a man would be better leading the safety crew, that supervisor did like having the crew run by girl were direct evidence of sex discrimination), *and Hartung v. Cae Newnes, Inc.*, 229 F. Supp. 2d 1093, 1100 (D. Or. 2002) (finding comment by supervisor that plaintiff was "too old" to work at the company, combined with numerous other age-based comments was direct evidence of discrimination), *with Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (finding statement that "we don't necessarily like grey hair" was stray remark because unrelated to employment decision or the plaintiff), *and Noga*, 583 F. Supp. 2d at 1257 (finding statement that Noga "was old enough to be her mother" was stray remark; "Stray remarks are remarks unrelated to the decisional process, and are insufficient to demonstrate that the employer relied on illegitimate criteria.") (internal quotation and citation omitted).

Moreover, Barrett's retweet of the article in July 2013 cannot be viewed as evidence of discriminatory animus. Barrett's retweet occurred some fifteen months prior to Plaintiff's employment at Opal, and Plaintiff proffers no evidence that Barrett's retweet was directed at

Plaintiff, was seen by Plaintiff, was shared with anyone at Opal, or was viewed by anyone at Opal. Thus, Barrett's statements and retweet are better characterized as circumstantial evidence.

Similarly, Gorman's statements were not directed at Plaintiff and are described by Plaintiff as being made in an offhand manner, and Gorman's statement regarding an "old guy in his forties" referred to someone other than Plaintiff. Thus, Gorman's statements are at best stray remarks. *See Nesbit*, 994 F.2d at 705 (finding comment that "[w]e don't necessarily like grey hair" uttered in ambivalent manner and not tied to employee's termination a stray remark); *Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438-39 (9th Cir. 1990) (holding that a hiring executive's comment that he chose "a bright, intelligent, knowledgeable young man" over the plaintiff was merely a stray remark that could not, without more, establish age discrimination).

Likewise, Crowe's "old Greg" statement is not tied in any fashion to Plaintiff's termination, was not uttered by either Barrett or Gorman, and is not direct evidence of age discrimination under Plaintiff's proffered theory. In his deposition, Plaintiff admitted the Buscemi gif was not sent to him, did not refer to him in any way, and was posted on a Slack channel. Because there is no connection between Crowe's "old Greg" statement or gif posted by co-workers and Plaintiff's termination, that evidence clearly does not rise to direct evidence of age discrimination. *Noga*, 583 F. Supp. 2d at 1257 (statement by coworker that plaintiff was old enough to be her mother was stray remark). Thus, viewing the alleged comments and statements identified by Plaintiff individually or collectively, they are not direct evidence of age-based discriminatory animus.

C.     *Circumstantial Evidence*

Opal contends that Plaintiff fails to satisfy a prima facie case of discrimination, arguing that Plaintiff cannot meet prongs two and four of his prima facie case. Concerning prong two, Opal

argues that Plaintiff was not meeting expectations for his job, and that his employment ended because he failed to show up for an important client telephone conference and failed to inform anyone that he would not be present. Additionally, Opal contends that Plaintiff was failing to meet expectations, pointing out that Plaintiff failed to properly manage and build an integration for the Nike account in early 2015, failed to create a "demo environment" for the Apple account in March 2015, and had received several complaints about his technical capabilities from his supervisors from early 2015 through May 2015. With respect to prong four, Opal maintains that Plaintiff was not replaced by a substantially younger employee because his job duties were absorbed by Barrett and other employees. (Barrett Decl. ¶ 8, ECF No. 116; Giannini Dep. 19:18-21, ECF No. 117-1.) Opal argues that for two years following Plaintiff's termination, no person was hired whose primary job duties consisted of integrations engineering. (Giannini Dep. 197:4-8, ECF No. 117-1.) Opal argues that Plaintiff was not replaced, let alone by someone younger, and therefore, he cannot make out a prima facie case of age discrimination.

In response, Plaintiff argues that he was performing his job adequately and that his job duties were unclear, and he highlights that he never received any written criticism of his work. Plaintiff also contends that he received positive feedback from several co-workers and that Barrett never provided negative, critical feedback prior to his termination.

       1.     satisfactory job performance

With respect to prong two, Plaintiff has satisfied the minimal burden of establishing that he was performing his job satisfactorily. Plaintiff was employed by Opal for only seven months, and in that time he did not receive any formal performance evaluations. Barrett testified in his deposition that he had a discussion with Plaintiff about his work performance over coffee, but

admits he did not document performance issues "in any kind of formal written process." (Barrett Dep. 184:15-22, ECF No. 117-3.) Plaintiff was not on a performance improvement plan, and, despite Opal's contention that he mishandled some integration roll-outs with Nike and Apple in early 2015, he nevertheless was provided the opportunity to work with Whole Foods in May 2015. In light of the low evidentiary threshold to establish a prima facie case and the court's duty to view the evidence in the light most favorable to Plaintiff, he has produced competent evidence such that a reasonable jury could find that he was adequately performing his job. *See Lanyon*, 2018 WL 1976023, at *2 (finding terminated employee demonstrated satisfactory job performance where deficiencies were minor and infrequent despite being on last chance agreement because prima facie evidentiary bar is low); *Hannan v. Bus. Journal Publications, Inc.*, Case No. 3:14-cv-00831-SB, 2015 WL 9265959, at *9 (D. Or. Oct. 2, 2015), *adopted* 2015 WL 7720496 (Nov. 30, 2015) (finding that employee who received mixed performance reviews but was never warned she was at risk for termination presented prima facie evidence of adequate job performance).

2.     replaced by a younger employee

With respect to prong four, the parties dispute whether Opal hired anyone to fill Plaintiff's position. Opal contends that Plaintiff's job duties were absorbed by Barrett and other backend engineers. Opal argues that for two years after Plaintiff's termination, it did not hire any person whose primary job duties consisted of integrations. Opal highlights that prior to Plaintiff's hiring, Barrett performed nearly all the software engineering for integrations, and that after Plaintiff's termination, those job duties reverted to Barrett's portfolio. (Barrett Decl. ¶¶ 4-5, ECF No. 108.) Giannini testified in his deposition that Opal has never filled the Lead Enterprise Engineer position and that Barrett did "the majority of the heavy lifting," with assistance from other backend

engineers. (Giannini Dep. 19:7-21, ECF No. 111-5; Munsinger Decl. Ex. 4, attaching Giannini Dep. 196:11-24, 197:4-8, ECF No. 126-4.) Barrett provides that he re-assumed primary responsibility for integrations formerly performed by Plaintiff, with assistance from other backend engineers. (Decl. Daniel Barrett ¶¶ 10-11, ECF No. 125.)

In contrast, Plaintiff argues that a reasonable jury could conclude that Opal hired Alex Hunley, age thirty-two, to perform the engineering duties, and that Opal hired Mark Wood, age twenty-nine, to perform the customer success duties. *See France v. Johnson*, 795 F.3d 1170, 1174 (9th Cir. 2015) (holding that an age difference of ten years or more between the plaintiff and replacements will be presumptively substantial; less than ten years is presumptively insubstantial). Plaintiff argues that Hunley simply lacked the technical expertise to be a "lead" at the time he was hired, and that Barrett was coaching Hunley to fulfill Plaintiff's role. Plaintiff argues that Barrett absorbed Plaintiff's job duties only for a short time, and that within six months, Hunley took over integrations. Plaintiff points to the deposition of Mary Artz, who worked in the product department, who testified that for six months after Plaintiff left, Barrett and Gorman absorbed Plaintiff's job duties. (Artz Dep. 9:17-21, ECF No. 117-5.) Artz also testified that Hunley was part of the backend engineering team, and the Barrett and Gorman delegated many integration tasks to Hunley. (Artz Dep. 10:1-9, 10:17-11:4.) Plaintiff also highlights Hunley's job description, which included the following: "[a]ct as technical point person for features and troubleshooting of Opal integrations." (Maurushia-Laurain Dep. 192:2-10, ECF No. 117-6.)

Opal responds that Hunley was not a lead engineer, did not have primary responsibility for integration, and did not contact customers to obtain integration specifications and functionality as Plaintiff previously had done. (Barrett Decl. ¶ 11, ECF No. 125.) Gorman testified in his deposition

that Alex Hunley was not hired to be a replacement for Plaintiff, was hired one month after Plaintiff was terminated, and that Hunley was part of the backend engineering team. (Munsinger Decl. Ex. 3, attaching Gorman Dep. 262:20-263:11, ECF No. 126-3.) Marushia-Laurain, Opal's operations manager, testified in her deposition that Barrett absorbed Plaintiff's job duties. (Maurushia-Laurain Dep. 192:17-24, ECF No. 126-5.) Shane Smith-Sahnow, an Opal employee, testified that after Plaintiff left, no specific person took over integrations, and that Hunley was a backend engineer. (Munsinger Decl. Ex. 6, attaching Dep. Shane Smith-Sahnow taken on June 20, 2017 ("Smith Sahnow Dep." 52:11-53:7, ECF No. 126-6).

Viewing the evidence in the light most favorable to Plaintiff, and given the low evidentiary bar to establishing a prima facie, the court finds that Plaintiff has established a prima facie case that Hunley was asked to perform at least some of Plaintiff's integration job duties, and that the presumption applies here because Hunley was at least ten years younger than Plaintiff. *Wallis*, 26 F.3d at 889, 891 (noting the degree of proof to establish a prima facie case at summary judgment "is minimal"). Because the court finds that Plaintiff has established prong four with respect to Hunley, the court declines to address the evidence concerning Mark Wood. Therefore, the court finds that Plaintiff has demonstrated a prima facie case, and the burden shifts to Opal to demonstrate legitimate, nondiscriminatory reasons for Plaintiff's termination.

### D.    *Opal's Legitimate Non-Discriminatory Reasons for Plaintiff's Termination*

Opal argues that it terminated Plaintiff because he was a no-call, no-show for a phone call for which his attendance was critical. (Giannini Decl. ¶ 7, ECF No. 110.) As Stewart provided, he twice confirmed that Plaintiff would be on the call with Whole Foods, and further indicated that Plaintiff's participation in the phone call was critical because Stewart lacked the expertise and

access to the integration demonstration that was to take place. (Stewart Dep. 56:20-57:14, ECF No. 111-9.) Stewart was furious that Plaintiff missed the call, and he indicated that the client was frustrated. (*Id.*) Opal contends that Plaintiff's flagging job performance had been previously discussed by management, and his supervisors expressed concerns about Plaintiff's technical abilities shortly after his employment began. (Gorman Decl. ¶¶ 13-16 & Ex. 1 at 1-4, ECF Nos. 112 & 112-1.) The acute nature of the Whole Foods missed call accelerated the decision to terminate Plaintiff's employment. Giannini considered input from Gorman, Robert Scott, and Matt Oxley, and made the decision to terminate Plaintiff. (Giannini Decl. ¶¶ 6-7, ECF No. 110.) Plaintiff does not dispute that Opal has articulated a legitimate, non-discriminatory basis for his termination. Accordingly, the court finds that Opal has articulated legitimate, non-discriminatory reasons for terminating Plaintiff.

### E. Pretext

To avoid summary judgment, once Opal has articulated legitimate, nondiscriminatory reasons for its decision, the burden shifts to Plaintiff to raise a genuine dispute of material fact that Opal's proffered reasons are simply pretext for age discrimination. *France*, 795 F.3d at 1175; *see Wallis*, 26 F.3d at 890. "A plaintiff asserting age discrimination can 'demonstrate pretext in either of two ways: (1) directly, by showing that unlawful discrimination more likely than not motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable.'" *France*, 795 F.3d at 1175 (quoting *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112-13 (9th Cir. 2011)). Circumstantial evidence must be specific and substantial. *Godwin*, 150 F.3d at 1222.

Ultimately, plaintiff "retains the burden of persuasion to establish that age was the 'but-

for' cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180, (2009). In other words, a plaintiff must do more than "produce some evidence that age was one motivating factor in [an employment] decision." *Id.* A plaintiff must show, at the summary judgment stage, that a reasonable trier of fact could conclude, by a preponderance of the evidence, that he would not have been fired but for impermissible age discrimination. *See, e.g., Scheitlin v. Freescale Semiconductor, Inc.*, 465 F. App'x. 698, 699 (9th Cir. 2012) (applying *Gross's* "but for" causation standard at the summary judgment stage).

### 1.     pretext and same actor inference

Opal argues that it is entitled to application of the same actor inference because Giannini was responsible for both hiring and firing Plaintiff. Generally, where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, a strong inference arises that there was no discriminatory action. *Coghlan v. Am. Seafoods Co.*, LLC, 413 F.3d 1090, 1096 (9th Cir. 2005) (citing *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 271 (9th Cir. 1996)). The court is required to consider this "strong inference" when deciding a motion for summary judgment. *Id.* at 1098; *see also Schechner v. KPIX–TV*, 686 F.3d 1018, 1026 (9th Cir. 2012) (the "same-actor inference is a strong inference that a court must take into account on a summary judgment motion") (internal quotation marks omitted). If the inference applies, then Plaintiff must present a "strong case of bias necessary to overcome this inference." *Coghlan*, 413 F.3d at 1098. The same actor inference "amplifies the plaintiff's burden at the pretext stage." *Qualls v. Regents of the Univ. of California*, No. 1:13-CV-00649-LJO-SMS, 2015 WL 6951757, at *4 (E.D. Cal. Nov. 10, 2015) (citing *Coghlan*, 413 F.3d at 1096) (holding the plaintiff's burden was "especially steep in this case because of the [same actor inference]"). Opal contends that the same actor inference applies

here because Giannini hired Plaintiff knowing Plaintiff was at least forty years old, and that he was responsible for Plaintiff's termination some seven months later. (Giannini Decl. ¶ 5, ECF No. 110.)

Plaintiff contends that the same actor inference does not apply because Opal has not established that Giannini was the decision-maker responsible for hiring and firing him. Plaintiff indicates that Giannini did not participate in interviewing him at the time he was hired, that Gorman signed Plaintiff's offer letter, and that Gorman testified he made the decision to hire Plaintiff. (Gorman Dep. 59:3-4, ECF No. 117-2.; Giannini Decl. Ex. 1, ECF No. 110-1; Pl. Decl. ¶ 2, ECF No. 116.) The court agrees with Plaintiff. The evidence presented to the court shows that Gorman and Barrett presented Giannini with the idea for creating a Lead Enterprise Engineer position and that Gorman, not Giannini, largely was responsible for hiring Plaintiff, including signing the Offer Letter. Although Gorman later testified in his deposition that Giannini ultimately "makes the final hiring decision," Plaintiff has created an issue of fact as to whether Giannini or Gorman was responsible for hiring him, or if Giannini was merely a participant in the process. (Gorman Dep. 79:11-15, ECF No. 117-2.) Even if Giannini had to sign off on all hiring and termination decisions, on the record before the court, Opal has not demonstrated that Giannini was so involved in the hiring decision that applying the same actor inference is proper. *See Russell v. Mountain Park Health Ctr. Props. LLC*, 403 F. App'x 195, 196 (9th Cir. 2010) (finding genuine issue of fact existed as to whether same actor was responsible for hiring and firing the plaintiff, and not entitled to same actor inference on summary judgment); *but see Maybin v. Hilton Grand Vacations Co.*, Inc., 343 F. Supp. 3d 988, 996-96 (D. Haw. 2018) (applying same actor inference where person with ultimate authority to hire and fire interviewed the plaintiff); *Juell v. Forest Pharm., Inc.*, 456 F. Supp. 2d 1141, 1155 (E.D. Cal. 2006) (applying same actor inference did not

apply because person participating in decision did not have ultimate hiring and firing authority).

        2.      pretext and "Cat's Paw" theory

Plaintiff also argues that Giannini was simply a rubber stamp decision-maker for Barrett and that Barrett's bias influenced the decision-making process. The fact that Barrett was not the ultimate decision-maker with respect to Plaintiff's termination is not determinative.

Under a "Cat's Paw" theory, liability may be imposed where a subordinate with discriminatory animus without ultimate decision-making authority influences the decision-maker to take adverse action. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 419-20 (2011) (applying Cat's Paw theory to Uniformed Services Employment and Reemployment Rights Act violation); *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007). The Ninth Circuit has recognized that a "plaintiff can establish a causal link by proving that 'the biased subordinate influenced or was involved in the decision or decisionmaking process.'" *France*, 795 F.3d at 1176 (quoting *Poland*, 494 F.3d at 1182). Plaintiff maintains that he has established a causal link between Barrett's age-bias and Giannini's decision to terminate Plaintiff's employment. According to Plaintiff, Barrett originated the plan to terminate Plaintiff and pushed that decision upwards "creating an environment where a minor transgression by plaintiff – missing a phone call – resulted in the huge organizational overreaction that caused plaintiff to be terminated virtually on the spot." (Pl.'s Resp. Mot. Summ. J. at 35, ECF No. 118.) Plaintiff argues that Barrett and Gorman falsely assured others on the executive team that they had numerous discussions with Plaintiff about his poor performance, when, in fact, they did not have any formal discussions with Plaintiff about his performance. Plaintiff maintains that Barrett and Gorman essentially poisoned the well, such that when the Whole Foods incident occurred, Giannini already viewed Plaintiff as a poor performer who had

refused to improve despite performance counseling. (*Id.* at 36.)

Viewing the evidence in the light most favorable to Plaintiff reveals that Barrett did not have formal, ongoing discussions with Plaintiff concerning performance. Instead, the evidence shows that Barrett had coffee with Plaintiff on one occasion in January 2015, and that at the meeting, Barrett did not reference potential discipline or corrective action. (Barrett Dep. 171:2-173:9, ECF No. 117-3.) Barrett admits that there is no formal, written documentation concerning Plaintiff's performance. (Barrett Dep. 193:19-194:1, ECF No. 117-3.) By February 2015, Barrett expressed that he wanted Plaintiff terminated. (Gorman Dep. 242:8-25, Ex. 36, ECF No. 117-2.)

The evidence also shows that in April 2015, Barrett and Gorman met with Marushia-Laurain, who noted an absence of any documentation or corrective action concerning Plaintiff's performance. (Marushia-Laurain Dep. Ex. 45, ECF No. 117-6.) Marushia-Laurain was specifically concerned about the absence of corrective action and performance evaluations, and she discussed moving Plaintiff to a different position at Opal better suited to his strengths, rather than terminating his employment. (Marushia-Laurain Dep. 136:3-22, Ex. 54, ECF No. 117-6.) Additionally, Plaintiff has presented evidence that Gorman discussed Plaintiff's perceived performance problems on multiple occasions at higher level meetings of the executive team. (Angeli Decl. Ex. A, attaching Giannini Dep. 144:15-21, ECF No. 117-1.) Giannini testified that Plaintiff was not meeting performance expectations, and that Giannini understood that numerous meetings regarding Plaintiff's performance had already occurred, both of which beliefs are contradicted by Plaintiff's and Marushia-Laurain's testimony. (Giannini Dep. 187:17-21, 190:19-25, ECF No. 117-1.) Giannini also admitted that if the Whole Foods missed meeting had been an isolated incident, he may not have terminated Plaintiff. (Giannini Dep. 191:2-11, ECF No. 117-1.) And,

Scott testified at his deposition that based on Plaintiff's reaction at the time of his termination, he surmised that there had not been previous discussions with Plaintiff about his performance in the previous months or weeks. (Scott Dep. 121:13-23, ECF No. 117-7.)

Thus, Plaintiff has presented evidence from which a jury could conclude that Barrett and Gorman pushed Plaintiff's poor performance up to the decision-maker, Giannini. Based on the chain of events described above, the court concludes that a reasonable factfinder could find that Barrett, a subordinate employee, was involved in and influenced Plaintiff's termination decision. *See France*, 795 F.3d at 1176. Plaintiff has demonstrated that Barrett influenced the decision-maker Giannini, creating a causal connection between Barrett's age-bias and his termination. Consequently, Opal's motion for summary judgment on this basis is denied.

Plaintiff also contends that Opal's shifting reasons for his termination indicate that age discrimination is the true reason for his termination. Plaintiff observes that: (1) other younger employees were not disciplined for missing telephone calls; and (2) Opal has provided shifting rationales for his termination.

Plaintiff argues that his termination for missing a meeting is demonstrably false. Plaintiff highlights that several Opal representatives and employees testified they were unaware of any other employee being disciplined for missing a meeting. Giannini testified that missing a phone call in isolation may not have been sufficient grounds for termination. (Giannini Dep. 191:1-11, ECF No. 117-1.) Plaintiff also indicates that Robert Scott testified that other employees missed meetings and did not face any discipline. (Scott Dep. 123:3-13, ECF No. 117-7.) While Scott did acknowledge that he was not aware of any other employees facing discipline for missing a meeting, Scott also testified that "I'm not aware of any incident where an employee has missed a meeting

as important as the Whole Foods meeting without providing advance notice." (Scott Dep. 123:23-124:9, ECF No. 117-7.) Plaintiff also indicates that Marushia-Laurain testified Plaintiff was not terminated for performance issues, but rather was terminated because he missed the Whole Foods meeting. Marushia-Laurain also testified that Opal would never terminate an employee for performance reasons without providing feedback.

There is a genuine dispute as to whether Plaintiff was terminated for performance issues, or whether he was terminated for missing the Whole Foods meeting, or a combination of both issues. Again, Plaintiff has presented evidence demonstrating he would not have been terminated solely for missing the meeting. Giannini testified in his deposition that he believed Barrett and Gorman had been engaging in corrective action with Plaintiff. Gorman informed Huff via Slack that Plaintiff had been provided numerous opportunities to course correct, but he had failed to do so. (Gorman Dep. 142:19-142:2, ECF No. 117-2.) But, Barrett admitted that he did not have any formal conversations with Plaintiff about his performance to explain the severity of the performance issues. Again, when viewing the evidence in the light most favorable to Plaintiff, the court concludes that Plaintiff has presented evidence from which a reasonable trier of fact could conclude that Opal has provided inconsistent reasons for his termination. *See Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 661 (9th Cir. 2002) (holding that "fundamentally different justifications for an employer's action" can give rise to an inference of pretext (internal quotation and citation omitted)). Accordingly, because Plaintiff has demonstrated a genuine issue of fact as to pretext, Opal's motion for summary judgment on Plaintiff's age discrimination claim is denied.

III.     Plaintiff's Defamation and Invasion of Privacy Claims

In his Ninth and Tenth claims for relief, Plaintiff contends that Opal defamed him and

invaded his privacy by false light when Giannini and Scott made remarks concerning his termination at a company-wide meeting during the week of June 1, 2015. Plaintiff alleges that during the meeting, Giannini and Scott explained that Plaintiff had been terminated for cause and suggested that he had engaged in misconduct, and that Plaintiff had rejected opportunities to improve his performance. (SAC ¶ 110, ECF No. 94.) Plaintiff further alleges that he had a reasonable expectation that personnel decisions, including the reasons for his termination, would not be publicized to his former coworkers. (*Id.* ¶¶ 116-119.)

Opal argues that the information learned by Plaintiff about the meeting came from deposition testimony obtained during discovery in this case. Opal contends that Plaintiff's defamation per se and invasion of privacy claims are not tenable under Oregon law because the statements are subject to a qualified privilege, and therefore fail as a matter of law. Plaintiff responds that Giannini's statements could be construed as defamatory, that Opal has not demonstrated that a qualified privilege applies, and that a jury must determine if Opal abused any qualified privilege that may apply.

A.     *Legal Standards for Defamation Per Se and Invasion of Privacy*

For a defamation claim to survive summary judgment under Oregon law, a plaintiff must produce evidence to allow a reasonable jury to find: (1) the making of a defamatory statement; (2) the publication of the defamatory material; and (3) a resulting special harm, unless the statement gives rise to a presumptive special harm. *Redwind v. Western Union, LLC*, Case No. 3:14-cv-01699-AC, 2016 WL 3606595, at *6 (D. Or. May 2, 2016), *adopted* 2016 WL 3410183 (D. Or. June 16, 2016), *aff'd* 698 F. App'x 346 (9th Cir. 2017); *Neumann v. Liles*, 358 Or. 706, 711 (2016) ("To establish a claim for defamation, a plaintiff must show that a defendant made a defamatory

statement about the plaintiff and published the statement to a third party."). Publishing or communicating the defamatory statement "is an essential element of an action for defamation." *Wallulis v. Dymowski*, 323 Or. 337, 342-43 (1996). "A statement is defamatory if it 'subjects a person to hatred, contempt or ridicule or tends to diminish the esteem, respect, goodwill or confidence in which she is held or excited adverse, derogatory or unpleasant feelings or opinions against her.'" *Redwind*, 2016 WL 3606595, at *6 (quoting *Worley v. Ore Physicians Serv.*, 69 Or. App. 241, 244 (1984)); *Nat'l Union Fire Ins. Co of Pittsburg Pa. v. Starplex Corp.*, 220 Or. App. 560, 584 (2008); *Farnsworth v. Hyde*, 266 Or. 236, 238 (1973).

In the professional context, "a statement is defamatory if it is false and ascribes to another conduct, characteristics or a condition incompatible with the proper conduct of his lawful business, trade, [or] profession." *Brown v. Gatti*, 341 Or. 452, 458 (2006) (alteration in original, internal quotations and citations omitted). "Such words must cast aspersions on the plaintiff's ability to perform essential functions, or must assert that the plaintiff lacks a characteristic necessary to successful performance, of his or her job." *Nat'l Union*, 220 Or. App. at 584-85 (citing *L & D of Oregon, Inc. v. Am. States Ins. Co.*, 171 Or. App. 17, 25-26 (2000)). Courts generally have held that a person is defamed if his reputation is tarnished among a substantial and respectable minority of the community or of the defamed's associates. *Farnsworth*, 266 Or. at 238. Whether a statement is capable of a defamatory meaning is a decision for the court. *Redwind,* 2016 WL 3606595, at *7; *Farnsworth*, 266 Or. at 238. "To be actionable, a communication must be both false and defamatory." *Reesman v. Highfill,* 327 Or. 597, 604 (1998). If the court determines that the communication is capable of a defamatory meaning, "'the matter is submitted to the jury for a determination of whether a defamatory meaning was understood by the recipients.'" *Brown*, 341

Or. at 459 (quoting *Beecher v. Montgomery Ward & Co.*, 267 Or. 496, 500 (1973).

> B.     *Opal's Statements About Plaintiff's Termination*

Plaintiff alleges that shortly after his termination, Giannini and Scott convened a meeting with Opal's thirty-five to forty employees. (Giannini Dep. 248:11-13, ECF No. 117-1.) At that meeting, Giannini informed the employees that it terminated Plaintiff for cause, "and those are things that we don't discuss, and if you have specific questions we ask you to come talk to a member of the executive team, and that was basically it." (Giannini Dep. 248:1-18, ECF No. 117-1.) Scott testified at his deposition that Plaintiff was the first employee Opal had ever terminated, and that it was generally understood at Opal that "you probably have to screw up really bad to get fired." (Scott Dep. 42:14-15, 43:8-12, ECF No. 117-7.) Scott testified that that the executive team wanted to reassure employees and summarized Giannini's message as follows:

> You know, actually, Mr. Giannini delivered the message, a very heartfelt message that we felt like we did everything we could as a company to support Mr. Robillard and there was – we didn't really – we were left without – without a decision. We – we had to take that – we had to take that course, and to reassure everyone that, you know, "If you're doing your job and you show up and you're adequately respectful of your colleagues and our customer relationships, then you don't need to fear that result."

(*Id.* at 43:17-25.)

Plaintiff argues that the court must initially determine whether the statements are capable of defamatory meaning. Plaintiff contends that the statements are a general criticism of his work and imply that he lacked skill and competence normally expected by someone in that job. Plaintiff highlights that Derek Miller, a former Opal employee who attended the meeting, stated that Opal fired Plaintiff "for cause" and understood that to mean that Plaintiff had done something "so egregious the company did not have any choice" but to terminate Plaintiff. (Decl. Derek Miller

Page 45 – OPINION AND ORDER

"Miller Decl." ¶ 13, ECF No. 52-2.) According to Plaintiff, a reasonable jury could conclude that Opal's statements were false and that Opal's motion for summary judgment must be denied.

The court addresses whether the statements by Giannini are defamatory, either on their face or by implication. *See Reesman*, 327 Or. at 603 (providing that defamation by implication requires drawing a defamatory inference from a facially nondefamatory communication; the inference must be reasonable and not "too tenuous"). The evidence before the court reveals that Giannini informed Opal employees that Plaintiff was terminated "for cause." Plaintiff insists that the statement is false and defamatory because Opal provided conflicting information about the reasons for his termination – that is, whether he was terminated for missing the Whole Foods meeting, or for poor performance. Plaintiff insists that the statement is capable of defamatory meaning because it implies that Plaintiff was a poor performer. *See Bock v. Zittenfield*, 66 Or. App. 97, 100 (1983) (employer's comment that former reporter "simply didn't perform his job" was capable of defamatory meaning). The court disagrees.

Here, even if Opal has provided two reasons for Plaintiff's termination, his failure to show up at the Whole Foods meeting without providing advance notice clearly qualifies as "for cause." Because Giannini's statement that Plaintiff was terminated for cause was truthful, this statement is not actionable on the facts presented in this case. *Reesman*, 327 Or. at 603 (stating that to be actionable, alleged defamatory statement must be false).

Next, with respect to Giannini's statements that Opal had done "everything we could" and that Opal was left "without a decision," the court is not convinced that these statements are capable of defamatory meaning. Nevertheless, even assuming arguendo the statements could be construed as capable of defamatory meaning, they fail as a matter of law because they are conditionally

privileged. A defamatory statement is subject to a qualified privilege if: "(1) it was made to protect the defendant's interests; (2) it was made to protect the interests of the plaintiff's employer; or (3) it was on a subject of mutual concern to the defendant and the persons to whom the statement was made." *Redwind,* 2016 WL 3606595, at *7; *Mannex Corp. v. Bruns*, 250 Or. App. 50, 59 (2012) (citing *Wallulis*, 323 Or. at 350). Courts afford wide latitude to statements by managers and co-workers about an employee's work performance. *See Mannex Corp.*, 250 Or. App. at 60 (discussing work-related statements). "A defamatory work-related statement . . . concerning another employee's work performance falls into either the second or third category" of statements to which the conditional privilege applies. *Id.* (quoting *Wallulis*, 323 Or. at 350-51). At least one court has determined that promoting "workplace harmony" is within the interests of an employer, the employer's manager, and other employees. *Id.*

The qualified privilege "may be lost if the publisher does not believe or lacks reasonable grounds for belief in the truth of the alleged defamatory statement; if the defamatory matter is published for a purpose other than that for which the privilege is given; if the publication is made to a person not reasonably believed to be necessary for achieving the purpose of the privilege; or if the publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose of the privilege." *Araujo v. General Elec. Info. Servs.*, 82 F. Supp. 2d 1161, 1172 (D. Or. 2000), *aff'd* 25 F. App'x 615 (9th Cir. 2002) (finding employer had qualified privilege to disclose to its own employees the reasons for plaintiff's termination). To overcome a privilege, a plaintiff must produce evidence of "some kind of improper motive on defendant's part." *Wattenburg v. United Medical Lab.*, 269 Or. 377, 380 (1974). Employers generally have a qualified privilege to inform their employees of the reason for a co-employee's termination. *See*

*Vanderselt v. Pope*, 155 Or. App. 334, 345 (1998); *Bickford v. Tektronix, Inc.*, 116 Or. App. 547, 551 (1992).

Plaintiff argues that Opal abused the privilege. Plaintiff contends that Opal has failed to demonstrate that Giannini's statements made at the company-wide meeting were made to protect Opal's interests or to protect employee morale. Plaintiff argues that employee morale could not have been a concern because Giannini testified in his deposition that although he had concerns about how employees were feeling about Plaintiff's termination, no one approached him to specifically discuss it. (Giannini Dep. 249:7-250:7, ECF No. 117-1) ("In the case of Mr. Robillard, there were no concerns that anyone talked to me about or that I was aware of[.]") And, Plaintiff argues that a cursory investigation would have revealed that Barrett had failed to undertake corrective action. Plaintiff appears to contend that Giannini did not have a reasonable basis for believing that Opal had done all it could to turn Plaintiff's performance around, forcing Opal to terminate Plaintiff.

Viewing this evidence in the light most favorable to Plaintiff, the court finds that merely because no Opal employee specifically approached Giannini does not demonstrate, by itself, that Opal abused the privilege to communicate with its employees about the reasons for Plaintiff's termination. *See Araujo*, 82 F. Supp. 2d at 1172 (finding employee failed to produce evidence demonstrating employer did not have qualified privilege to inform employees information about termination). As Scott testified, Plaintiff was the first employee that Opal had terminated and he and Giannini were concerned about the impact on Opal's employees. Additionally, the court is not convinced that Giannini's alleged failure to conduct an investigation into whether effective performance coaching had occurred prior to making the statements does not reveal an improper

motive or that Giannini did not reasonably believe the statements were true. Giannini testified that Gorman and Barrett had previously discussed Plaintiff's performance at executive team meetings and that Giannini believed that corrective action was taking place. Barrett testified that he had ongoing, informal discussions with Plaintiff and Gorman testified that he understood that Barrett had been engaging in performance discussions with Plaintiff.

Additionally, that Barrett did not have formal, documented corrective action, standing alone, does not mean that Giannini lacked reasonable grounds to believe his statements at the time or that Giannini acted with an improper motive when speaking to Opal employees about the reasons for Plaintiff's termination. *See Bickford*, 116 Or. App. at 551 (granting summary judgment to Textronix, finding employer did not abuse qualified privilege to discuss reasons for employee's termination at meeting with sixty employees). After missing the Whole Foods meeting with Stewart, Oxley informed Giannini that he had lost confidence in Plaintiff. Giannini could consider all of Plaintiff's employment history at Opal and form an opinion about the reasons for Plaintiff's termination, and communicate that opinion to Plaintiff's coworkers. Regardless of whether formal or informal performance discussions occurred, Plaintiff has presented no evidence establishing that Giannini lacked a reasonable basis for believing the statements at the time he made them, or that or that he acted with an improper motive in communicating his opinion to Opal employees. The court finds no reasonable jury could conclude that Opal abused the qualified privilege. *Araujo*, 82 F. Supp. 2d at 1172. Accordingly, Opal's motion for summary judgment on Plaintiff's ninth claim for defamation is granted.

C. *Invasion of Privacy by False Light Standards*

For Plaintiff to avoid summary judgment on a false light claim, he must come forward with

evidence to create an issue of fact on the following elements:

> (1) the defendant gave publicity to a matter concerning the plaintiff that places the plaintiff before the public in a false light; (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person; and (3) the defendant had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed.

*Robillard v. Opal Labs, Inc.*, 337 F. Supp. 3d 962, 971 (D. Or. 2018) (citing *Marleau v. Truck Ins. Exch.*, 333 Or. 82, 92, 37 P.3d 148, 154 (2001)). To be actionable, the matter must be: (1) false, and (2) publicized. *Robillard*, 337 F. Supp. 3d at 971; *Marleau*, 333 Or. at 93. The publication element differs from publication in defamation cases because for false light "the matter must be published to the public generally or to a large number of persons." *Morrow v. II Morrow, Inc.*, 139 Or. App. 212, 220 (1996). A defendant may be liable for both defamation and false light based upon the same conduct. *Magenis v. Fisher Broadcasting, Inc.*, 103 Or. App. 555, 558 (1990); *Slover v. Oregon State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570, 927 P.2d 1098, 1101 (1996).

Plaintiff's false light claim is premised on the same set of facts as those upon which he based his defamation claim. Examining those facts in the light most favorable to Plaintiff, the court finds that Plaintiff has failed to create a reasonable issue for trial on his false light claim. First, as discussed above, the statement that Plaintiff was terminated for cause is not false and cannot form the basis of Plaintiff's false light claim. Second, even assuming *arguendo* as false the statements "we did everything" to support Plaintiff and that Opal "was left without a decision" as to Plaintiff's termination, Plaintiff has not come forward with any evidence to suggest that Giannini made the statements with reckless disregard as to their alleged falsity.

As noted above, Giannini testified that he was informed by Gorman that conversations with

Plaintiff about improving his competency and expectations had occurred. (Giannini Dep. 111:5-15, 112:7-16, ECF No. 111-5.) And Gorman believed that Barrett had discussions with Plaintiff about improving his performance.

Plaintiff insists that a cursory investigation would have revealed that neither Gorman nor Barrett had given Plaintiff any formal performance feedback. Examining the record in the light most favorable to Plaintiff, the facts before the court show that Giannini believed that performance correction discussions had occurred. (Giannini Decl. ¶¶ 10-15, ECF No. 110.) Regardless whether formal or informal performance feedback occurred, Plaintiff has presented no evidence that Giannini lacked a reasonable basis for believing Gorman and Barrett when they stated that such performance correction discussions had occurred. Therefore, Plaintiff has not created an issue of fact as to whether Giannini made the alleged statement that Opal was left with "no choice" in reckless disregard of its falsity. *See Lewis v. Carson Oil Co.*, 204 Or. App. 99, 105 (2006) (finding summary judgment properly entered on defamation claim where employee failed to create issue of fact as to whether defendant lacked reasonable basis for believing report that formed basis for termination). Accordingly, Opal's motion for summary judgment on Plaintiff's tenth claim for invasion of privacy is granted.

IV.   Opal's Counterclaims for Breach of Contract, Trade Secrets, and Defend Trade Secrets

Opal moves for summary judgment on its three counterclaims for Breach of Contract, Uniform Trade Secrets Act, OR. REV. STAT. § 646.461, and Defend Trade Secrets Act, 18 U.S.C. § 1832. (Def.'s Answer & Countercls. ¶¶ 64-86, ECF No. 97.) Opal contends that Plaintiff publicly posted its private source code without permission, breached his contractual confidentiality obligations to Opal, and misappropriated trade secrets. Plaintiff cross-moves for summary

judgment on Opal's counterclaims, insisting that the Shoutlet code is not a protected trade secret as a matter of law, and that summary judgment should be awarded in his favor.

### A. Opal's Breach of Contract Counterclaim

#### 1. standards

In order to prevail on a breach of contract claim, a plaintiff must allege the existence of a contract, its relevant terms, plaintiff's full performance of the contract and lack of breach, and defendant's breach resulting in damages to plaintiff. *Matchniff v. Great Nw. Ins. Co.*, 224 F. Supp. 3d 1119, 1124 (D. Or. 2016); *Bromfield v. HSBC Bank Nevada*, Case No. 3:13-cv-00462-SI, 2014 WL 183895, at *6 (D. Or. Jan. 13, 2014); *Olmstead v. ReconTrust Co.*, Case No. 3:11-cv-00964-HA, 2012 WL 442225, at *3 (D. Or. Feb. 9, 2012); *Slover*, 144 Or. App. at 570. "Under Oregon law, '[a] breach is material if it goes to the very substance of the contract and defeats the object of the parties entering into the contract.'" *Woods v. Wells Fargo Bank, N.A.*, Civ. No. 6:13-00457-AA, 2014 WL 334253, at *4 (D. Or. Jan. 28, 2014) (quoting *Bisio v. Madenwald*, 33 Or. App. 325, 331 (1978)). Also under Oregon law, a plaintiff must plead and prove her own substantial performance of the contract's terms. *Strasser v. BAC Home Loan Serv.*, No. 3:11-cv-01432-JE, 2014 WL 6686717, at *6 (D. Or. Nov. 24, 2014).

#### 2. analysis

Opal contends it is undisputed that Plaintiff signed an Employment Agreement on November 10, 2014, and that the Employment Agreement includes a section entitled "Confidential Information." (Giannini Decl. Ex. 1 at 2-4, ECF No. 110-1). Confidential Information is defined in the Employment Agreement to include "trade secrets," "software and related documentation, including, without limitation, source or object codes for such software" among other things. (*Id.*

at 4.) In the Employment Agreement, Plaintiff agreed that he would not improperly disclose any of Opal's Confidential Information. (*Id.*) To that end, the Employment Agreement contains the following restrictions:

> 8.4.1 Employee shall not, at any time or in any manner or form, directly or indirectly, disclose, make available or communicate to any individual, company, agency or other entity any Confidential Information.
>
> 8.4.2 The foregoing restriction applies to Employee both during and after termination of Employee's employment with Company.
>
> 8.4.3 Confidential Information and Confidential Materials may not be disclosed, reproduced, summarized or distributed except in reasonable pursuance of the authorized duties of Employee on behalf of Company.

(*Id.*)

Opal also argues that it is undisputed that Plaintiff posted Opal's code – Shoutlet and Suez – on a public website without its permission. Opal contends that it has suffered damages in the form of loss of its clients' trust, and attorney fees in creating and sending the Cease and Desist letters in an effort to protect its code.

Plaintiff does not appear to dispute that he signed the Employment Agreement on November 10, 2014, and that it constitutes a valid contract. However, he disputes that his posting of the Shoutlet API and Suez API are material breaches of the Employment Agreement and that Opal suffered any damages as a result. Plaintiff argues that he created the Shoutlet code entirely on his public GitHub account while employed by Opal and that Opal consented, either explicitly or implicitly, to him posting the code on his public GitHub account. Plaintiff contends that it is industry standard for small utility API libraries, such as Shoutlet, to be released as open-source libraries. (Pl. Dep. 182:8-20, ECF No. 117-4.) Additionally, Plaintiff contends that in March 2015, Barrett reviewed his work on the Shoutlet code and that it should have been apparent to Barrett

that the code was hosted on Plaintiff's personal, public GitHub account, and not a private Opal repository. (*Id.* at 186:5-22.) According to Plaintiff, because Barrett did not object to the Shoutlet code being publicly posted when Barrett reviewed the code, Opal implicitly gave him permission to post the code, and that he did not breach the confidentiality agreement.

The court finds that numerous issues of fact prevent summary judgment in favor of either party on Opal's breach of contract counterclaim. The record shows that Plaintiff admitted that at least some of Opal's source code was confidential and that Opal wanted to keep confidential code from disclosure. (*Id.* at 183:4-22, 267:20-268:4.) The parties also dispute whether Plaintiff created the Shoutlet code on his Opal laptop using an application, Sublime, or on his public GitHub account. (*Id.* at 167:16-18, ECF No. 117-4; Pl. Supp. Dep. 51:11-53:19, ECF No. 126-1.) And, there is a genuine dispute whether Opal gave Plaintiff permission to post the Shoutlet code publicly. Plaintiff testified in his September 5, 2018 deposition that Gorman did not expressly authorize Plaintiff to take the Shoutlet code open source. (Pl. Supp. Dep. 70:8-14, ECF No. 126-1.) The court also is not convinced that Opal implicitly gave permission to publicly disclose the Shoutlet code simply because Barrett did not object when Barrett conducted a review of the Shoutlet code. Plaintiff points to no evidence that Barrett reviewed the Shoutlet code on Plaintiff's GitHub account at that time, and that he understood it to be a public repository. Indeed, Barrett provides that he has no memory of seeing the Shoutlet code on Plaintiff's public GitHub account prior to Plaintiff's termination in May 2015. (Barrett Decl. ¶ 6, ECF No. 125.) Although, Plaintiff has provided evidence that Opal may have made a similar API library for Spredfast open source. (Pl. Supp. Dep. 70:15-20, ECF No. 126-1.) Therefore, issues of fact exist as to whether Opal gave

Plaintiff permission to post the Shoutlet code in his public GitHub account, and summary judgment on Opal's first counterclaim is denied.

> B.   *Opal's Counterclaims under the Oregon Uniform Trade Secrets Act, OR. REV. STAT. § 646.461 et seq and Defend Trade Secrets Act, 18 U.S.C. § 1834*

> 1.   legal standards

To state a claim for misappropriation of trade secrets, Opal must demonstrate that: (1) the subject of the claim qualifies as a statutory trade secret; (2) Opal employed reasonable measures to maintain the secrecy of its trade secrets; and (3) Plaintiff's conduct constitutes statutory misappropriation. *Acrymed, Inc. v. Convatec*, 317 F. Supp. 2d 1204, 1217 (D. Or. 2004) (citing *W. Med. Consultants, Inc. v. Johnson*, 835 F. Supp. 554 (D. Or. 1993)). The statute defines "trade secret" as "information . . . that derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." OR. REV. STAT. § 646.461(4). Misappropriation includes the improper acquisition, disclosure, and use of a trade secret, including the "use of a trade secret of another without express or implied consent by a person who, at the time of disclosure or use, knew or had reasons to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." OR. REV. STAT. § 646.461(2)(d); *Vesta Corp. v. Amdocs Mgmt. Ltd*, Case No. 3:14-cv-01142-HZ, 2018 WL 4354301, at *14 (D. Or. Sept. 12, 2018). "In many cases, the existence of a trade secret is not obvious; it requires an ad hoc evaluation of all the surrounding circumstances. For this reason, the question of whether certain information is a trade secret ordinarily is best resolved by a fact finder after full presentation of

evidence from each side." *Kaib's Roving R. PH Agency, Inc. v. Smith*, 237 Or. App. 96, 103 (2010); *Vesta*, 2018 WL 4354301, at *17.

The Defend Trade Secrets Act ("DTSA") of 2016 created a private right of action for owners of trade secrets that are misappropriated "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1); *Physician's Surrogacy, Inc. v. German*, Case No. 17cv718-MMA (WVG), 2018 WL 638229, at *4 (S.D. Cal. Jan. 31, 2018). A "trade secret" includes "all forms and types" of information, including financial, technical, programs or codes, that derives value from being secret and that the owner took reasonable measures to keep secret. 18 U.S.C. § 1839(3)(A)(B). "Misappropriation" consists of: (a) "acquisition of a trade secret" by a person who knows or should know the secret was improperly acquired; or (b) "disclosure or use of a trade secret of another without express or implied consent." *Id.* § 1839(5)(A)(B). The DTSA "contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use." *Cave Consulting Group, Inc., v. Truven Health Analytics Inc.*, Case No. 15-cv-02177-SI, 2017 WL 1436044, at *3 (N.D. Cal. Apr. 24, 2017); *Physician's Surrogacy*, 2018 WL 638229, at *4.

2.      analysis

In its second and third counterclaims, Opal contends that Plaintiff misappropriated its trade secrets by publicly posting its confidential information on his personal GitHub account. The parties have filed cross-motions for summary judgment, largely reasserting their arguments set forth with respect to Opal's first counterclaim.

Again, the court finds that genuine issues of fact prevent summary judgment on Opal's counterclaims. First, it is unclear whether the Shoutlet or Suez repositories qualify as trade secrets.

Plaintiff admits that some of Opal's source code is confidential, but Plaintiff testified in his deposition he created much of the Shoutlet API from publicly available code, which he then modified to suit Opal's needs. Plaintiff also contends that it is common in the software programming industry for API's similar to the Shoutlet and Suez code to be publicly posted. Thus, it is unclear whether the Shoutlet and Suez code is generally known in the public or if it is "high level" such that economic value can be gained from its disclosure. *See Vesta*, 2018 WL 4354301, at *17 (finding issue of fact prevented summary judgment on whether information satisfied statutory definition of trade secret).

Second, the court finds that issues of fact exist whether Opal employed reasonable measures to maintain the secrecy of its alleged trade secrets. The court must examine whether the trade secret was "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." OR. REV. STAT. § 646.461(4)(b). "In this district, the court has found '[a]bsolute secrecy is not a prerequisite for trade secret protection; the precautions taken need only be reasonable,' and 'confidential disclosures to employees, licensees, and other will not destroy the secrecy necessary for protection as a trade secret.'" *Vesta*, 2018 WL 4354301, at *15 (quoting *Amvac Chem. Corp. v. Termilind, Ltd.*, No. CIV. 96-1580-HA, 1999 WL 1279664, at *7 (D. Or. Aug. 3, 1999)). Plaintiff asserts that Opal provided no training to Plaintiff about its source code and maintaining its secrecy. Yet, Opal required all engineering employees, including Plaintiff, to sign an employment agreement that specifically provides that Opal's code is confidential. Thus, the court concludes that whether Opal's efforts to maintain the secrecy of its alleged trade secrets and confidential information are reasonable is an issue best left for the trier of fact. *Vesta*, 2018 WL 4354301, at *16 (denying summary judgment on trade secret claims because issue of facts existed

as to whether defendant took reasonable measures to protect trade secrets where conflicting information existed as to secrecy of technical information, including APIs).

And third, as discussed at length above with respect to Opal's first counterclaim, there are issues of fact concerning whether Opal gave Plaintiff permission implicitly to publicly post the Shoutlet code on his personal GitHub account. Therefore, because numerous issues of fact require resolution, and the parties' motions for summary judgment on Opal's second and third counterclaims are denied.

V.     Plaintiff's Retaliation Claims

In claims six, seven, and eight, Plaintiff contends that Opal filed its breach of contract and trade secret counterclaims in response to Plaintiff pursuing wage violations under state and federal law and age discrimination in the current action. (SAC ¶¶ 73-109, ECF No. 94.) Opal moves for summary judgment on Plaintiff's three retaliation claims. Opal contends that Plaintiff cannot demonstrate that its counterclaims are "baseless" and the record is devoid of any evidence of a retaliatory motive, it is entitled to summary judgment on Plaintiff's retaliation claims. Plaintiff cross-moves for summary judgment on his retaliation claims. Plaintiff submits that Opal has no good faith basis to believe that its Shoutlet or the Suez repositories contain confidential information or are entitled to trade secret protection and that no reasonable jury could conclude that Opal's counterclaims have a reasonable basis in law or fact.

*A.     Legal Standards*

To establish retaliation under the ADEA, Title VII, the FLSA, or Oregon's parallel anti-retaliation law, a plaintiff must demonstrate that he was: (1) engaged in protected activity; (2) the employer took an adverse employment action against the plaintiff; and (3) a causal link between

the protected and the adverse action. *Ray v. Henderson*, 217 F.3d 1234, 1242–43 (9th Cir. 2000). An adverse employment action is "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Id.* at 1242-43; *accord Mack v. Town of Pinetop Lakeside*, 780 F. App'x 451 (9th Cir. 2019) (upholding summary judgment in employer's favor on retaliation claims because plaintiff did not demonstrate adverse employment action). As this court has discussed, Plaintiff was engaged in protected activity by filing suit to recover unpaid wages and alleging age discrimination. *Robillard*, 337 F. Supp. 3d at 974. The question here is whether Opal's counterclaims for breach of contract and misappropriation of trade secrets constitute an "adverse employment action."

Courts have recognized that counterclaims filed by former employers may constitute actionable retaliatory conduct "when they have no basis in law and fact and were filed with retaliatory motive." *Grimsley v. Charles River Labs., Inc.*, 467 F. App'x 736, 738 (9th Cir. 2012); *see also Robillard*, 337 F. Supp. 3d at 972 ("[C]ounterclaims can support a retaliation claim when the counterclaims are baseless, brought in bad faith, brought with a retaliatory motive and lack a reasonable basis in law and fact, or are designed to deter claimants from seeking legal redress because of their 'in terrorem effect.") (internal quotations and citations omitted) (collecting cases). "Importantly, only lawsuits that are 'baseless in fact or law' may support a retaliation claim, for baseless suits are those which do not implicate the claimant's right to petition a court for its own redress of grievances." *Castillo v. Joann Urquhart, M.D., P.C.*, No. 8:17-cv-01810-PX, 2019 WL 4750294, at *7 (D. Md. Sept. 30, 2019) (quoting *Darveau v. Detecon, Inc.*, 515 F.3d 334, 341 (4th Cir. 2008)). Thus, to survive summary judgment, Plaintiff must demonstrate that Opal's counterclaims were filed with a retaliatory motive and lack a reasonable basis in fact or law.

*B.     Analysis*

Plaintiff argues that but for filing this action, Opal may not have filed its counterclaims. Plaintiff contends that Barrett and Gorman discovered that he posted Opal's Shoutlet API on his public GitHub site on the day that Plaintiff was terminated, yet Opal waited until after Plaintiff initiated this lawsuit to file its counterclaims. The court is not convinced that simply because Opal waited for over a year to file its counterclaims that the court must presume a retaliatory motive. Nevertheless, even if the court presumes a retaliatory motive, Plaintiffs retaliation claims fail as a matter of law.

Plaintiff cannot establish that Opal's counterclaims lack a reasonable basis in law or fact. As discussed at length above, the court has determined that genuine issues of fact exist on Opal's breach of contract and trade secrets claims. As one court has recognized, "the ultimate standard for determining whether a counterclaim has a 'reasonable basis' is whether there is a genuine issue of material fact." *See Munroe v. PartsBase, Inc.*, Case No. 08-80431-CIV, 2009 WL 413721, at *9 (S.D. Fla. Feb. 18, 2009) (quoting *Barnes v. Akal Sec., Inc.,* No. 04-1350-WEB, 2005 WL 1459112, *6 (D. Kan. June 20, 2005)) (granting summary judgment on retaliation claims where court found issues of fact on breach of confidentiality counterclaims); *Castillo,* 2019 WL 4750294, at *8 (noting that where summary judgment was denied on counterclaim, it is not baseless). Because Plaintiff cannot demonstrate that Opal's breach of contract and trade secrets claims are baseless in law or fact, their filing cannot constitute an adverse action sufficient to support his retaliation claims. Accordingly, the court concludes that Opal is entitled to summary judgment on Plaintiff's retaliation claims; and Plaintiff's cross-motion for summary judgment is denied. *Munroe*, 2009 WL 413721, at *9; *Castillo*, 2019 WL 4750294, at *8 (granting summary judgment

on retaliation claim where counterclaim found to be grounded in fact and law). Plaintiff's retaliation claims are dismissed with prejudice.

## VI.  Opal's Affirmative Defense of Mitigation of Damages

In its first affirmative defense, Opal pleads that Plaintiff failed to mitigate his damages by failing to seek or secure long-term alternative employment after his employment with Opal ended. (Def.'s Answer to Second Am. Compl., ECF No. 97.) In his motion for partial summary judgment, Plaintiff argues that Opal has failed to demonstrate that Plaintiff failed to take reasonable steps to obtain comparable employment.

### A.    Additional Facts Regarding Mitigation Defense

Plaintiff's employment with Opal ended on May 29, 2015. On June 2, 2015, Plaintiff indicated that he was "going to spend the summer looking around at consulting gigs." (Supp. Munsinger Decl. Ex. 16, ECF No. 126-16.) On June 25, 2015, Plaintiff was admitted to Portland State University for the Fall 2015 quarter. (Munsinger Decl. Ex. 16, ECF No. 126-16.) Plaintiff contends that he submitted applications for employment, networked with former colleagues, recruiters, staffing agencies, and tech companies, and met with industry contacts at Cloudability and Vacasa. (Pl. Decl. ¶¶ 70-73, ECF No. 116.) Plaintiff submits that from July 2015 through October 2015, he worked full-time as a software engineer with Sincerely Truman (Pl. Decl. ¶ 74, ECF No. 116.) Plaintiff also worked full-time from December 2015 through July 2017 at Spendwell Health. (*Id.* ¶ 74, ECF No. 116.)

In September 2015, Plaintiff indicated that he was available to work only three-quarters time on-site, but could work full-time remotely. (Supp. Munsinger Decl. Ex. 18, ECF No. 126-18.) In the fall of 2016, Plaintiff became a full-time graduate student at Lewis and Clark College

in counseling psychology. (Pl. Decl. ¶ 76, ECF No. 116; Pl. Supp. Dep. 12:3-15, ECF No. 126-1.)

During his September 5, 2018 deposition, Plaintiff acknowledged that he had not been working,

but instead was attending school full-time. (Pl. Supp. Dep. 12:1-10, ECF No. 126-1.) Plaintiff

began attending school full-time in September 2016, and that he continued to work full-time

through July 2017. (Pl. Supp. Dep. 12:1-10, ECF No. 126-1.) In his December 2018 declaration,

Plaintiff provides that he attended graduate school while working part-time as a consulting

software engineer for Visible City from September 2018 through August 2019. (*Id.* ¶¶ 74-75, ECF

No. 116.)

During Giannini's deposition as the Rule 30(b)(6) designee, Giannini testified that Opal

was aware that Plaintiff "applied for positions in the literary world" and "was potentially going to

go back to college." (Giannini Dep. 215:12-216:3, ECF No. 117-1.) And, in response to the

question "Is Opal aware of any job that Mr. Robillard was offered and did not accept," Giannini

responded "I – I'm not aware." (*Id.* at 215:12-216:3.)

B.      *Legal Standards: Mitigation of Damages Defense*

A discharged employee seeking an award of back pay has an obligation to "to use

reasonable diligence in finding other suitable employment. *Ford Motor Co. v. EEOC*, 458 U.S.

219, 232 n.18 (1982); *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1497 (9th Cir. 1995). An

employer bears the burden of establishing that a former employee has not made reasonable efforts

to find employment following termination. *Haeuser v. Dep't of Law*, 368 F.3d 1091, 1100 (9th

Cir. 2004); *Shelton v. Fiskar Brands, Inc.*, No. 3:12-cv-1836-ST, 2015 WL 1299241, at *10 (D.

Or. Mar. 23, 2015); *Delima v. Home Depot U.S.A., Inc.*, 616 F. Supp. 2d 1055, 1093 (D. Or. 2008).

To toll the accrual of back pay, an employer must show: (1) substantially equivalent positions were

available during the time in question, (2) that the employee could have obtained an equivalent position, and (3) that the employee failed to use reasonable diligence in seeking a job. *Delima*, 616 F. Supp. 2d at 1093; *Sigl v. Travel Tags, Inc.*, No. 3:12-cv-01810-KI, 2013 WL 5223681, at *6 (D. Or. Sept. 16, 2013). An employer is released from the duty of establishing the availability of comparable employment if the employer can prove "that the employee made no reasonable efforts to seek such employment." *Haeuser*, 368 F.3d at 1100.

C.    *Analysis*

Plaintiff contends that there is no genuine issue of fact that he expended extensive and legally sufficient efforts to find employment after his termination. Plaintiff also argues that he was offered and accepted positions in software engineering prior to enrolling in the graduate program. Additionally, Plaintiff asserts that because Giannini testified that Opal was not aware of job that Plaintiff was offered and did not accept, it is now foreclosed from asserting this affirmative defense.

Opal responds that Plaintiff did not seek full-time work after his employment with Opal ended because he was intending to make a career switch. According to Opal, at no point following his termination did Plaintiff hold himself out as available for a full-time, permanent software engineering position. Opal maintains that issues of fact as to whether Plaintiff was diligently searching for work, and whether that work was "substantially similar employment" precludes summary judgment in Plaintiff's favor. Opal is correct.

The court finds that numerous issues of fact prevent summary judgment on Opal's affirmative defense of mitigation of damages. For example, in his deposition, Plaintiff indicated that he began studying counseling psychology full-time in the fall of 2016, and at his deposition

in September in 2018, he stated that he has not been working. Plaintiff held himself out as able to perform consulting work, but he was not willing to commit to full-time work. It appears that in September 2015, a Portland startup was looking for a Ruby on Rails Developer and reached out to Plaintiff. (Munsinger Decl. Ex. 18, ECF No. 126-18.) Plaintiff responded that he was "consulting, and can only commit to ¾ time on-site." (*Id.*) Similarly, in a November 2015 email to technology recruitment agency, he indicated that he was interested in "Freelance" work, as opposed to "Full-Time" employment. (*Id* Ex. 20, ECF No. 126-20.) Thus, viewing the evidence in the light most favorable to Opal, issues of fact remain as to whether Plaintiff was seeking full-time work and whether that work was substantially similar. Accordingly, Plaintiff's motion for partial summary judgment on Opal's affirmative defense of mitigation of damages is denied.

*Conclusion*

Based on the foregoing, Defendant's Motion for Summary Judgment (ECF No. 107) is GRANTED IN PART and DENIED IN PART as follows: Defendants' motion is GRANTED as to Plaintiff's first, second, sixth, seventh, eighth, ninth, and tenth claims for relief; it is DENIED as to Plaintiff's third, fourth, and fifth claims for relief, and is DENIED as to its first, second, and third counterclaims. Plaintiff's Motion for Partial Summary Judgment (ECF No. 115) is DENIED.

IT IS SO ORDERED.

DATED this _17th_ day of DECEMBER, 2019.


JOHN V. ACOSTA
United States Magistrate Judge